## In re NORWALK TIRE & RUBBER CO.
No. 23499.

United States District Court
D. Connecticut.
Oct. 5, 1951.

Donald F. Keefe, New Haven, Conn., for debtor.

Samuel Gruber, Stamford, Conn., for claimants.

HINCKS, Chief Judge.

This is a controversy growing out of the filing of two proofs of claims in the proceedings in reorganization of the Norwalk Tire and Rubber Co. The claimants Purcell and Lengyell were discharged from debtor's tire curing department on September 20, 1948, on the ground that they had wrongfully destroyed company property. It is the contention of claimants that the discharges were in violation of a collective bargaining agreement between their union,

Local 283 of the United Rubber, Cork, Linoleum and Plastic Workers, C.I.O., and the debtor. Their proofs of claim were for back pay, lost since the time of discharge, and reinstatement. Prompt objections to both claims were filed by the Trustee.

After extended hearings, the Referee granted Purcell's claim in the amount of $2,420, and Lengyell's in the amount of $2,120, in each case equal to the minimum lost wages from the date of discharge to the date on which the company's plant was first shut down after the filing of the Chapter X petition, less wages actually earned elsewhere. Reinstatement, or damages in lieu thereof, was denied. Both parties have petitioned for a review of the order. Claimants allege error only in the Referee's failure to allow them vacation pay in addition to their regular compensation: the debtor's trustee objects to the allowance of the claims in any amount.

There was no dispute that the claimants had been discharged. The trustee resisted the claims on the ground that the discharges were for just cause in that the claimants had wilfully and maliciously destroyed company property. Thereafter, concededly, the claimants requested an investigation of their discharge through the grievance procedure prescribed by the Union agreement with the Company and the Union Grievance Committee held three meetings to discuss the issue. At the end of the third meeting the Union representatives indicated that they considered the grievances settled in favor of the Debtor. Claimants were present only at the first meeting; shortly afterwards they circulated a handbill attacking the Union representatives for not representing them with sufficient vigor. The Union refused to take the dispute to arbitration as it might have done

under its agreement with the Company, and claimants then brought suit against the Debtor in a State court and after the intervention of bankruptcy filed the claims now in issue here. So much seems to have been undisputed.

The Referee further found that claimants were not present at all meetings of the Grievance Committee; that during the course of the grievance meetings a handbill, circulated by claimant Purcell, "apparently so upset the Union Representatives that they had the Grievance Committee hearings postponed so that they could seek advice from legal counsel"; and that "the Union did not adequately represent claimants * * * before the Grievance Committee." It may be added that no minutes were kept of the Grievance Committee proceedings and that the settlement in this case was not made part of any written agreement.

### Trustee's Petition

#### I.

■ I hold that the referee rightly overruled the trustee's contention that the settlement under the grievance procedure of the contract which was satisfactory to the Union was a bar to the claims here prosecuted by the individual employees.

The union-management agreement provided for certain protection to employees generally from discharge without "just cause". Under the agreement employees generally, as third-party beneficiaries, are entitled to the benefit of this protection and, beyond dispute a violation of that right would constitute a "grievance" within the meaning of the agreement.

Article II, Section 1, of the agreement under the heading "Grievance Procedure" is set forth in a foot-note.[1] It begins by

I.
"Agreement between The Norwalk Tire And Rubber Co., Norwalk, Conn., and Local Union No. 283 United Rubber, Cork, Linoleum and Plastic Workers, C.I.O., Norwalk, Conn. August 12, 1947. "Article II Grievance Procedure

"Section 1. Grievances shall be disposed of in the following manner:
"(a) Individual employees shall submit his or her grievance to the department Steward for negotiation with the department Foreman.
"(b) The Foreman shall, as soon as possible, but in any event within twenty-four hours, indicate his disposition of the grievance, or that satisfactory steps for

stating that "Grievances shall be disposed of in the following manner," and then sets up provisions for negotiation on three levels in the hierarchy of labor and of management.

Although the protection provided against discharges conditioned upon an absence of "just cause", there was no express language in the agreement to show an intent that a finding of just cause by management should be binding on the individual employee if the Union, after participating in the prescribed procedure for the disposition of grievances, should acknowledge satisfaction with the action of management and failed to invoke its permissive right to arbitration afforded by Act II, Sec. 1(f). So far as the agreement shows, such action on the part of the Union might stem (1) from concurrence in management's finding of just cause, or (2) from considerations of Union policy and the belief that the action, even if unsupported by the facts of the particular case, did not warrant further prosecution of the grievance, either by arbitration or by strike. But the question is posed whether in the absence of express language the agreement should be construed to mean that the action of the Union was binding on the employees and terminated their right to protection from discharge, as the Trustee contends.

A construction contrary to that advanced by the trustee is required when the problem is considered, as it must be considered, in the light of the contents of the entire agreement. Although the procedure for negotiation on the three specified levels (Art. II, Sec. 1(a) to (e) ) is mandatory, there is nothing there that purports to give binding effect to the results of negotiation. It is not until we come to Par. (f) of Section 1, that we find anything said about a decision which "shall be final and binding." And the *decision* which under Par. (f) is given binding effect is not one arrived at by negotiation: it is rather one which is the product of arbitration. It is significant that while the language relating to the process of negotiation is mandatory, the language providing for arbitration is permissive: upon the failure of negotiations "the grievance or grievances *may then be submitted* by either party" for arbitration. This suggests that the agreement was intended to give binding effect only to the product of arbitration the provision for which was permissive only, and not to the result of negotiations the provision for which was mandatory and silent as to any binding effect as to the individual grievance. Kadish v. N. Y. Evening Journal (N.Y.City Ct., Spec.Term, Part I, N. Y.County, 1940) 7 Labor Relations Reference Manual 672.

That such was indeed the meaning of the agreement is further indicated by Article I thereof. In Section 1 of this Article the company recognizes the Union as the exclusive *collective* bargaining agent

the investigation of the grievance are being taken.

"(c) Between the plant negotiating committee and the industrial relations manager. Grievances shall not be presented to the industrial relations manager except after disposition thereof by the Foreman, and all grievances shall be in writing and fully described on the form supplied by the company, signed by the aggrieved employee or employees and the Steward and with the disposition thereof by the Foreman indicated thereon.

"(d) The industrial relations manager shall be requested to announce a disposition of the grievance or that satisfactory steps for the investigation thereof are being taken as soon as possible, and in any event within twenty-four hours after a meeting with the negotiating committee.

"(e) Between the plant negotiating committee, assisted, if they desire, by a representative of the United Rubber, Cork, Linoleum and Plastic Workers of America, C.I.O. International Union, and a representative of the Company executives.

"(f) If the grievance shall not have been settled satisfactorily in the preceding steps of the grievance procedure or if no decision shall have been announced within three (3) working days after meeting with the negotiating committee, the grievance or grievances may then be submitted by either party to the U. S. Conciliation Service. Decisions of an arbitrator appointed by the Conciliation Service shall be final and binding on both parties."

and agrees through that agency to *bargain* "on all matters pertaining to the wages, rates of pay, hours of employment and other conditions of employment." This imports a recognition by Union and company that the Union was authorized to "bargain" and bargain "collectively", but does not import an assertion of authority by the Union *to settle* individual (as distinguished from "collective") *grievances*. This distinction between "wages, rates of pay, hours of employment and other conditions of employment" on the one hand, and "grievances" on the other hand is well recognized in the field of labor relations as is attested by Section 9(a) of the Labor-Management Relations Act, 29 U.S.C.A. § 159(a). And in Article I, Section 7, the Company recognizes a Union "grievance or negotiating committee" as the accredited representatives of the Union in grievance matters "*to negotiate unsettled grievances.*" This imports a recognition of authority in a Union committee only "to negotiate",— not authority *to settle* individual grievances. When the parties are thus shown by Article I to have understood that in the field of individual grievances the only function of the Union committee was *to negotiate* for settlements, Article II may not justly be construed to mean that concurrence between a Union committee and management was to have effect as a final settlement, absent the concurrence of individuals aggrieved.

The construction which I adopt is in harmony with a provision in Section 4 of Article II of the agreement wherein the Union promises certain cooperation in the event of unauthorized strikes. In return for this cooperation the company expressly foregoes any right which it might have to sue the Union *or its members*: its waiver of that basic right was not left to implication. If then, it had been intended by Section 1 of Article II that if cooperation by management with the Union in pursuing the specified procedure of negotiation should produce an accord effective finally to determine a right of an individual employee flowing from the Union-management agreement, and thus terminate the employee's legal remedy, one would have ex-

pected that for that result also the termination of the legal remedy would have been expressly stated.

It might superficially be suggested, in derogation of the construction which I accept, that the parties would not have thought it worth while to provide in Pars. (a) to (e) of Section 1 procedure for negotiation if it was intended that the result of negotiations were not to have binding effect. But this criticism overlooks the generally recognized salutary effect of the negotiation of labor disputes. Obviously litigation is a source of irritation to good labor relations. Negotiation is desirable to the extent that it may prevent litigation and strikes or terminates pending litigation and strikes. By negotiation nothing is lost and much may be gained: it is worth the effort even if in the occasional case undesirable litigation and strikes result. And in this particular case, it may be noted, negotiation proved its worth: although the result was not satisfactory to the individuals affected so that this litigation has resulted, it proved satisfactory to the Union and thereby perhaps obviated a strike. In the light of these reflections, the validity of the construction which I adopt is powerfully supported by the inherent reasonableness of the contract as so construed.

On the other hand, the agreement, if construed as the trustee urges, takes on an unreasonable flavor in that by its scope it facilitates at least indifference to the rights of the individual employee. Theoretically, at least, some of those rights may stem solely from his contract of employment by the Company, and hence have existence independent of the agreement: others, like the right to protection against unjust discharge here involved, stem solely from the union-company agreement. However, the scope of the agreement is so broad, dealing as it does with hours, wages and other conditions of employment, that it is well-nigh impossible to point to any right of substantial value to the employee which is not covered by the agreement. The agreement itself does not even purport to distinguish between rights of different origin: the terms "grievances" and "grievance matters" as used in the agreement appear to include

all claimed violations of individual right irrespective of their origin. Thus if the entire nexus of the individual's rights is subject to determination by the Union or a Union committee, there is the danger that his individual rights may not receive the individual consideration afforded by a court, or may be used for trading purposes in bargaining with management, or that their vindication may depend upon his position in the Union or his personal relations with committee members. Indeed, in this very case, it may be noted that the situation was such that if the Union had refused to accept the action of the company against the third shift, its action would have had the effect of putting the two earlier shifts under a cloud. With this in mind it may well have been that the action taken betokened no more than a Union policy of neutrality derived from conflicting pressures from which a court might be expected to be immune. Of course, at best, a closed shop agreement such as this imposes drastic restrictions on individual freedom of contract. But at least, without compelling language, it should not be so construed as to put the employee completely at the mercy of Union politics and Union officialdom. And the result is scarcely mitigated if it be so that the employee has a few surviving rights relating to subject-matter not covered by the contract for which a remedy at law exists.

All of the foregoing has been written upon the premise that the individual employee is not a party to the agreement but stands in this litigation as a third-party beneficiary thereunder. However, the same conclusion would be required if the remedy sought were asserted by the claimants as parties to a contract of employment by the debtor for violation of a right incident to their contracts of employment. For in the situation here, the terms of the Union agreement must necessarily be viewed as an inseparable part of the contract of hire between company and employee. And in that aspect also, it would require the construction which I adopt on the reasons stated in support thereof.

## II.

I hold that the referee erred in holding that for the trustee to prevail it was not enough for him to prove just cause for the discharges by a fair preponderance of the evidence.

No one quarrels with the proposition that in the situation here the burden of proving just cause was on the trustee. The only dispute is as to the applicable measure of that burden. The referee ruled that the proof required must be "clear and convincing",—proof of greater weight than would be required if the applicable measure was a fair preponderance.

Questions of substantive law in the allowance of claims in bankruptcy should normally be governed by the law of the appropriate state jurisdiction. 3 Collier on Bankruptcy (14th Ed.) 1780. The measure of the burden of proof is a matter of substantive law within the terms of this rule. Palmer v. Hoffman, 1943, 318 U.S. 109, at page 116, 63 S.Ct. 477, 87 L.Ed. 645; Cities Service Oil Co. v. Dunlap, 1939, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196. In this case the contract state is Connecticut.

The Supreme Court of Connecticut has established the rule that fraud, when in issue in equitable actions, must be proved by clear and convincing proof. Burley v. Davis, 132 Conn. 631, 46 A.2d 417; Basak v. Damutz, 105 Conn. 378, 135 A. 453. But it does not follow the rule prevailing in some jurisdictions whereby a wilful tort,—even one which is of such a nature as to constitute a crime—must be proved by clear and convincing evidence: rather, the established Connecticut rule is that recovery may be had for such a tort if the tort is proved by a fair preponderance of the evidence. List v. Miner, 74 Conn. 50, 49 A. 856; Mead v. Husted, 52 Conn. 53.

Here, the alleged conduct which constitutes the trustee's defense was in the nature of a malicious and wilful destruction of property and in Connecticut such acts constitute a crime. Conn.Gen.Stats.1949, Sec. 8463. But it is not disputed that the property in question was destroyed and beyond dispute the destruction was wilful and malicious. The only dispute is whether the destruction was accomplished by these claimants or by others. It thus appears that the only issue is as to the claim-

ant's acts—not as to their mental intent (which must necessarily have been malicious and wilful if the acts were theirs). Tested against this analysis, the open issue is one coming within the rule of List v. Miner, which the Referee, erroneously as I hold, failed to apply.

No qualification of this conclusion is required by the fact that the Trustee's evidence went no further than to tend to show that the destruction occurred in the third shift in which the two claimants, with one other, were the only operators; that it wholly failed to connect the destruction with any particular employee of the three. This is so because if the referee should find, for example, that any one of the three with knowledge of a malicious wrong done by his fellow worker failed to give reasonable cooperation with the company in its effort to fix the responsibility for that wrong, he might well come to the ultimate finding that such conduct constituted just cause for discharge. Cf. Keserich v. Carnegie-Illinois Steel Corp., 7 Cir., 163 F.2d 889. The conditions above postulated—knowledge and failure of reasonable cooperation—if put in issue are also facts which, to prevail, the trustee need prove only by a fair preponderance of the evidence. Thus if the Referee shall once find that the destruction was accomplished during the third shift, even absent evidence to show that a particular claimant committed the act of destruction it would be for the referee to find whether the trustee had proved conduct, active or passive, which constituted just cause for discharge.

### III.

█ Testimony by the witness Silverstone, an assistant attorney general assigned to the Connecticut Unemployment Compensation Division, established that after their discharge and within a period ending March 19, 1949, Purcell received $507 in unemployment compensation payments and Lengyell $481. The Referee held that he should not deduct these payments from the amounts due claimants. This ruling I sustain. National Labor Relations Board v. Gullett Gin Co., 1950, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337; Marshall Field & Co. v. N.L.R.B., 1943, 318 U.S.

253, 63 S.Ct. 585, 87 L.Ed. 744; Hayes v. Morris & Co., 1923, 98 Conn. 603, 119 A. 901; A.L.I. Restatement of Torts (1939), Sec. 924, comment on Clause (b).

### IV.

The trustee contends that the Referee erred in admitting, over the trustee's objection of hearsay, certain testimony of the witness Harry Silverstone, an assistant attorney general assigned to the Connecticut Unemployment Compensation Division. In this testimony the witness quoted from a report by an examiner of that division that the claimants' discharge was "based on suspicion with no actual proof as yet."

█ I rule that this objection should have been sustained. The oral testimony of the witness was plainly hearsay: indeed it appears to have been hearsay upon hearsay. The report to which the witness referred, if properly certified, and offered (which it was not) would have been admissible under the exception to the Hearsay Rule provided by Conn.Gen.Stats., 1949, Sec. 7888. But even if on a reopening it shall be received in evidence, it will none the less still be hearsay. There is no need to caution an experienced referee as to the weight to which it is entitled in comparison with primary records and the testimony of witnesses taken subject to cross-examination in the presence of the referee.

### V.

#### Disposition of Trustee's Petition

The posture of the claims is such that the referee's order of allowance should be set aside, and that the claims should be returned to the referee for reconsideration and appropriate action consistent with this memorandum. The basic need, of course, is for a finding on the ultimate question as as to whether the trustee has proved the justice of the discharges by a fair preponderance of the evidence.

I do not overlook the fact that in this memorandum I have not passed upon several contentions raised in the trustee's petition that specified findings are inadequate or unsupported by evidence. This omission stems from my belief that reconsideration of the subject-matter, aided by argu-

ment from counsel, may possibly lead the referee to modify or expand his findings and thus remove some at least of the contentions from controversy. In the foregoing, I have particularly in mind the contentions raised by Paragraphs 2(d), (e), (g), (h), (i), (j), all of which appear to be material under the rulings indicated above. I note that the contentions raised in Paragraphs 2(f) and (k), and 4(b), (c), (d) and (e) of trustee's petition are moot if the basis for my conclusion, announced above, as to the lack of finality in the grievance procedure, shall stand. Having in mind, however, the possibility of appeal from my ruling, I suggest that the referee consider these contentions also so that if the case shall come before the Court of Appeals there may be a complete and accurate record of his considered position.

Whether the referee shall permit the record of fact to be reopened and expanded is a question which, if it arises, will lie within his discretion. I will say only that in my opinion none of the rulings indicated in this memorandum make such a reopening imperative. But I apprehend that on such a point the referee should be free to rule as justice, in his view, shall suggest.

### Claimants' Petition in Review

The claimants allege error only in the referee's failure to include vacation pay in the allowance of their claims.

The union agreement provides (Article VIII) for vacations of specified duration and frequency, with pay. The findings show that the allowances ordered included for each claimant $67.20 a week for the period of absence from work resulting from the discharges. The evidence shows that both claimants had worked for the debtor for over one year but not for five years. Under the agreement, but for their discharge, they were entitled in each year to one week's vacation with pay therefor amounting to 2% of their total earnings for the year ending June 30th in the year preceding their vacation. But no evidence of such earnings am I able to find in the record.

If in 1948, the claimants each had had their week's vacation before September 20th, the date of their discharge, and had received the agreed pay therefor, clearly they would be entitled to no further vacation pay for 1948. If, however, on September 20, 1948 they were still entitled in 1948 to a week's vacation, and if their vacation pay computed under the agreement was more than the sum of $67.20 which the referee awarded them for each week of their absence, they would be entitled to an additional award in the amount of the difference.

 As for the year 1949, the award imposed no liability for any period subsequent to June 17th 1949 when the plant was shut down. And I find no evidence to support any finding that but for the discharges the claimants would have been entitled to a vacation in 1949 prior to June 17th.

In summary, I find little substance in the claimants' petition: if any additional award is in order at all for vacation pay, at most, according to my computations, it would amount to but a few dollars.

And so, partly because I find inadequate basis in the record to support the claimants' petition and partly because the subject-matter is well within the doctrine of "de minimis", I rule that the claimants' petition should be dismissed.