## FOOD FAIR STORES, INC. *v.* RAYNOR

[No. 28, September Term, 1959.]

 

*Decided October 21, 1959.*

*Motion for rehearing filed and denied November 20, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Albert L. Sklar* and *Theodore S. Miller,* with whom were *Abraham L. Adler, William E. Brannan* and *Sklar & Sullivan* on the brief, for appellant.

*Joseph S. Kaufman,* with whom were *Morton L. Goldner* and *Needle & Melnicove* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

Before us are questions of labor law and relations as to the right of an employee to sue for benefits claimed under a collective bargaining agreement between his union and the employer, questions which have not been too regular grist for American judicial mills.[1]

---

1. This country has lagged behind many other industrial countries in explicitly spelling out the rights of individuals under collective agreements and in providing adequate procedures to enforce those rights. For example, in Sweden, France, Germany and Austria, the law permits union and management to provide for arbitration of disputes involving collective conflicts. Yet, they all provide the individual employee a specially qualified tribunal, the labor courts, in which he can enforce rights arising out of the employment relationship, without resort to the union. Lenhoff, *The Present Status of Collective Contracts in the American Legal System,* 39 Mich. L. Rev. 1109. There is an increasing judicial and legis-

The appeal is by Food Fair Stores, Inc., operator of a chain of supermarkets, from a judgment on a jury's verdict for its employee Raynor for the difference in wages (some fifty cents an hour) between what he had been paid under a collective bargaining agreement between Food Fair and the union, and the contract rate of pay for the type of work he had in fact done. The agreement first was entered into as of August 1, 1954, by Food Fair and Truck Drivers and Helpers Local Union No. 355 of Baltimore (affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L.). It was identical with that entered into by the local union and all other major food chain stores in the area and, for this reason, was referred to as the master contract. It provided for a Taft-Hartley union shop (the employee must join the union within thirty days) and specified hours of work, holidays, rates of pay for various classifications, overtime, working conditions, a health

---

lative recognition in this country that proper protection of individual rights under collective agreements is necessary and desirable. This is true even among those whose personal interests as union or management officials lead them to dislike individual grievances. See Annotation *Labor Agreement-Employee's Right,* 18 A. L. R. 2d 352, 355; *Report of Committee on Improvement of Administration of Union-Management Agreements, 1954 — Individual Grievances,* 50 Nw. U. L. Rev. 143, 187. The Labor-Management Reporting and Disclosure Act of 1959, Public Law 86-257, 73 Stat. 519, in Title I, Sec. 101 (a) (4) provides: "No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: *Provided,* That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof. * * *" Section 101 (b) provides: "Any provision of the constitution and bylaws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect."

and welfare fund for life, health and accident insurance, and medical care and hospitalization benefits.

In addition there was in the contract one of the two provisions that led to this suit. It was:

> "Whenever employees other than Chauffeurs, with the consent of the Union, are required to drive trucks, they shall be paid the Regular Chauffeur's rate while so engaged."

The other provision was contained in an addendum to the master contract, an addendum necessitated when the maintenance employees of Food Fair selected the same local union as their bargaining representative. It was executed on October 19, 1955, effective as of August 1, 1954, provided for the hours and wages of the maintenance department employees and, referring to the master contract, said:

> "Except as otherwise stipulated above, all of the provisions contained in the collective bargaining agreement, effective August 1, 1954, and referred to hereinabove shall apply for the benefit of the employees in their respective classifications covered by this Addenda to the agreement."

Raynor went to work in the maintenance department of Food Fair early in March 1956 under an oral contract of employment, and served as a painter, carpenter and machine cleaner. He duly became a member of the local union. About a month after he went to work, he was told he was to drive a two and a half-ton stake body truck. Raynor says, although it was denied, that his shop steward told him that since he had been ordered to drive the truck, the union would see that he got truck driver's wages. On the other hand, his company supervisor bluntly told him he would not pay him chauffeur's wages. Since April 1956 Raynor has driven the truck almost daily from a warehouse to various Food Fair stores in Maryland and northern Virginia, hauling ladders, scaffolds, refrigerator cases, and maintenance and construction materials. He has never received chauffeur's pay.

In April 1957 the master contract was renewed without change except as to hours and rates of pay. On the same day an addendum covering the maintenance employees was executed. It, too, was substantially the same as the first addendum except that hours of work were reduced, pay was increased, and each of the eight members of the maintenance department was classified. All nine members of the department were given a fifteen-cent an hour increase in pay and Raynor twenty-two and one-half cents, that is an additional seven and one-half cents.

Both union and management have consistently agreed, as they do now, that Raynor was not the kind of chauffeur referred to in the collective contracts. He was given the additional raise because the president of the local union told the personnel director of Food Fair he was dissatisfied and suggested giving him ten cents an hour more. The counter offer was a "nickel" an hour and the compromise seven and one-half cents, and a classification of "oil burner apprentice," although neither before nor since did Raynor have knowledge of or experience with oil burners, nor did he work with them. The classification bore no relation to reality.

Raynor says he voted against the 1957 agreement because his claim as a truck driver was not recognized; the president of the local union says there were no negative votes.

Food Fair's defenses below were and here are: (a) that only as much of the master contracts as dealt with fringe benefits was incorporated in the addenda so the provision as to chauffeur's pay for de facto chauffeurs was not applicable to maintenance employees; (b) that the chauffeurs referred to in the master contracts were only those who drove the tractor-trailers that hauled food products from the warehouses to the stores; and (c) that there was an accord and satisfaction when Raynor accepted the seven and one-half cent an hour increase. It says it unjustifiably lost the benefit of the defenses by reason of the following errors below: (1) the court should have ruled as a matter of law that the collective bargaining agreement barred Raynor from successfully suing his employer since he had not first exhausted the grievance procedures existing for his benefit; (2) the jury should not have been allowed to interpret the contracts; (3)

the court should have held that the meaning both union and management put on the contracts was the right one; and finally (4) the jury should have been instructed bindingly that there had been an accord and satisfaction.

In *Jenkins v. Wm. Schluderberg-T. J. Kurdle Co.,* 217 Md. 556, Chief Judge Brune for the Court exhaustively reviewed and analyzed the principles and authorities governing the rights of the individual employee under collective bargaining agreements, and no good purpose could be served by doing more than synopsize what was there said.

Under any of several theories the individual employee may sue the employer for infringement of his individual rights under a collective agreement in the absence of some bar in the agreement.[2] The individual rights for which the employee can sue generally are held to be claims as to wages, seniority and wrongful discharge as opposed to matters of general union interest, such as union security, recognition and dues deductions, for example. See 2 Williston, *Contracts,* Rev. Ed., 1958 Cum. Supp. Sec. 379A, and the cases cited in the annotation *Labor Agreement-Employee's Right* in 18 A. L. R. 2d 352. In most instances the courts have held that before an employee can maintain a suit he must show that he has exhausted his remedies under the contract with the employer. The employer naturally does not wish to be harassed with complaints of, or suits as to, individual grievances. This is a main reason why many collective agreements provide for a detailed procedure through which grievances must be channeled. Some agreements provide that all grievances that are appealed beyond the first step must be reduced to writing, with a signed statement by the individual that he agrees to be bound by what the union does. Or the union constitution or bylaws may provide that the union shall be the exclusive and binding agent in the presentation and settlement of all grievances and matters arising out of the employer-employee

---

2. One theory is that the contract of hiring incorporates the collective agreement so that a breach of the latter is a breach of the former; another is that the individual is a third party beneficiary of the collective agreement, and a third is that the union is a trustee of the employer's promises for the benefit of the individual.

relationship. *Report of Committee on Improvement of Administration of Union Management Agreements, 1954,- Individual Grievances,* 50 Nw. U. L. Rev. 143, 152. These provisos in contracts and constitutions were more frequently found after the decision of the Supreme Court in *Elgin, Joliet and Eastern R. Co. v. Burley,* 325 U. S. 711, 89 L. Ed. 1886. There a group of employees filed a grievance through the union claiming back pay for alleged violations of starting time provisions. The union agreed to surrender these money claims in return for an explicit company promise establishing future rights. Later the union refiled the claims before the National Railroad Adjustment Board, which found they had been disposed of by the prior settlement. The Supreme Court held that the individuals could maintain suits for the pay, in the absence of a showing of authorization to the union to bind the employees, saying that the mere filing of a grievance through the union does not establish, as a matter of law, the authority of the union to settle the grievance.

The contracts before us contain little, if any, more than do those Professor Cox describes as the "simplest forms." [3] Most significantly, they contain neither grievance procedures nor rights to arbitration. The implications and inferences of intent as to individual grievances are quite different in such simple contracts from those in more elaborate ones which set up machinery for continuous administration through joint efforts of union and management and, in which, if it is not explicitly stated, it is implicit that the union is to represent the individual not only in collective bargaining but in interpretation of the agreement and in settlement of disputes. On the other hand, there are thousands of agreements, like the one before us, which Professor Cox, in his article, *Rights under a Labor Agreement,* 69 Harv. L. Rev. 601, 653, analyzes as follows:

> "Apart from the recognition clause and other sections defining the union's status, their chief function is to set up a wage scale and schedule of hours with provision for overtime. Today some fringe

---

3. 69 Harv. L. Rev. 601, 605.

benefits are usually included, such as paid holidays, premiums for Saturday and Sunday work, and employer contributions to pension and health and welfare funds. Such contracts are largely self-executing in the sense that they require scant implementation through day-to-day negotiation. Few questions of interpretation can arise, and when they do there is little likelihood of internal competition among the interests of different employees in the bargaining unit. Alleged contract violations turn chiefly on questions of fact; their outcome will have little weight as precedent. Many of these contracts contain neither a grievance procedure nor provision for arbitration. *A fortiori they do not purport to permit the enforcement of the employer's obligations by the collective bargaining representative."* (Emphasis supplied.)[4]

There is nothing in the collective contracts before us to indicate that the individual employee does not have the right to sue the employer without first asking the union to represent him in the prosecution of his claim.

---

4. Professor Cox continues: "Under this form of agreement the problem of reconciling the rights of the individual employee and the union takes on a different cast. Most of the justifications for channeling all claims into a union-controlled grievance procedure disappear, while the interests of the individual, which remain undiminished, become predominant. The omission of administrative machinery also suggests that the union feels little interest in being able to supervise claims of contract violation and little need for a single forum which will reduce the chance of discrimination and competition among individuals. Under such circumstances it is probably an accurate reflection of the intention of the contract to say that apart from promises benefiting the union as an organization, its only function is to establish a wage scale and other terms of employment which the employer promises to incorporate into individual contracts of hire. The union's rights would be confined to the enforcement of promises running to its benefit as an organization and to relief against repudiation of the wage scale as distinguished from isolated instances of alleged nonpayment, not because a rule of law commands this decision but because it is a fair interpretation of the relationship the parties intended to establish."

Food Fair, recognizing that the contracts do not help it on this point, turns to the constitution and laws of the local union and then to custom and usage. We have not been persuaded that any of these afford it legal comfort or sustenance. First, it is said that Raynor is bound by his signed application for union membership to abide and be governed by the constitution and laws of the union, and that they require him to follow certain procedures and, inferentially, that they bind him to what the union does in his behalf. Assuming this defense to be available to the employer in a suit to which the union is not a party, we see nothing in the union's written rules requiring Raynor to do anything before suing. Section 3 of the constitution covers a "controversy with an employer, not covered by a local union agreement," in which case the local union may be compelled by the parent union to arbitrate (if the employer agrees). The matters here in controversy are covered by the collective agreements, one way or the other, and the section relied on would seem inapplicable in terms. Article XII, in the first few sections, deals with "strikes, lockouts, wage scales and disputes over jurisdiction" and with collective bargaining, not settlement of individual grievances. It, too, is inapplicable. Section 14 of Article XII, under the heading "Exhaustion of Remedies" provides that "Every member * * * against whom charges have been preferred * * * or against whom adverse rulings or decisions have been rendered shall be obliged to exhaust all remedies provided for in this Constitution and by the International before resorting to any other court or tribunal." What these remedies are has not been specified nor even indicated to us. Section 14 has no meaning under these circumstances.

The president of the local union testified that the custom was that any aggrieved employee must give a written complaint to his shop steward, who attempts to adjust the grievance with the employer, and that "if the shop committeeman can't settle it, then it is the responsibility of the business agent of the union to visit with the employer and try and make an adjustment." Other than not putting his complaint in writing, Raynor did what the president said should be done, and so did the union, which made no point that the complaint had

not been put in writing. There is nothing to indicate, nor is it to be supposed, that the union would have done more or that the result would have been different if Raynor had followed the custom testified to (it was not shown that he knew, or should have known, of the custom). It is not contended that the union did not agree to Raynor's driving the truck. The president of the local union frankly said he told Raynor he had no case and was not entitled to chauffeur's wages and further said that he did nothing for Raynor except to suggest a ten-cent raise for him, and that he did not seek, and had no intention of seeking, arbitration (which would have been entirely optional with Food Fair). Raynor is not to be penalized because he did not do that which would have been meaningless and futile. *United Protective Workers of American v. Ford Motor Co.,* 194 F. 2d 997, 1001-1003; *Pattenge v. Wagner Iron Works* (Wis.), 82 N. W. 2d 172; *Nichols v. National Tube Co.,* 122 F. Supp. 726, 728; *In re Norwalk Tire & Rubber Co.,* 100 F. Supp. 706-710. Cf. *Transcontinental & West. Air. Inc. v. Koppal,* 345 U. S. 653, 97 L. Ed. 1325, and *Marvin v. Thomas J. Hoffman, Inc.,* 117 N. Y. S. 2d 697.

Although Food Fair did not make the point directly and specifically, it was not entitled to the directed verdict it sought on the ground that, as a matter of law, Raynor either authorized the union bindingly to settle his claim or that he ratified the compromise it made. Raynor says he told the president to try to get him truck drivers' wages and was told the president would see what could be done. When the second contract, which repeated unchanged the controversial items as to de facto truck drivers and the incorporation of all master contract provisions into the addendum by reference, was presented to the maintenance employees Raynor says he voted against it because it did not give him truck driver's wages and asked the union president to keep on trying to get him that scale of pay. When his pay check came in carrying the seven and one-half cent increase, he told his company supervisor he did not want that raise, he wanted truck driver's wages, just as he kept telling the union. The union admittedly did not make Raynor's claim as he made it,

much less press it. What it did is quite similar to what the union did in the *Jenkins* case, where the union did represent the employee up to the final step of seeking arbitration, and the employee was held entitled to sue.

Food Fair did not ask to have the issues of binding representation, or ratification, as such, submitted to the jury, nor did it except to the charge to the jury on these points, so that the propriety of such submission, *vel non,* is not before us. Maryland Rule 554 (d) and (e).

We turn to the question of the interpretation of the contracts. Food Fair contends that the meaning of the writings in the light of the parol testimony as to what the contracting parties intended (introduced over Raynor's repeated objections) is so clear that no reasonable mind could reach more than one conclusion as to their meaning and, therefore, under the rule enunciated in 3 Williston, *Contracts,* sec. 616, p. 1774 (Rev. Ed. 1936), "the court will properly decide the question of fact for itself as it may any question of fact which is equally clear." We are inclined to the view that the court itself could have ruled that the writings meant what Raynor contended they meant. The master contracts say that "whenever employees * * * drive trucks * * * they shall be paid the regular chauffeur rate * * *" There is no ambiguity in those words nor are any unusual or esoteric terms employed. Each of the addenda provides: "Except as stipulated * * * all of the provisions in the Collective Bargaining Agreement * * * shall apply for the benefit of the employees * * * covered by this Addenda." As the Supreme Court said in *Baltimore National Bank v. State Tax Commission,* 297 U. S. 209, 212, 80 L. Ed. 586, 589: "In such a situation the burden is heavily on the suitor who would subject the word 'all' with its uncompromising generality to an unexpressed exception."

Raynor, the appellee, was not harmed by the submission of the writings to the jury since it found in his favor. The meaning of the writings, in the light of the parol evidence, was not so clear that no reasonable man could have found them to mean only what Food Fair wanted them to mean. The witnesses were not in accord as to what was included

in "fringe benefits" which, they said, were the only master contract provisions that were to apply to the addenda. The jury properly could have considered not only the plain words of the writings, the inexactness and different opinions of the witnesses in defining fringe benefits, that drivers of Food Fair bakery department trucks of the same size as that driven by Raynor received truck drivers' wages, but also that Raynor's company supervisor reported in writing to the Workmen's Compensation Commission early in 1957 that Raynor's duties were those of "maintenance man and chauffeur."

The trial court did not err in refusing to accept the joint interpretation of the union and the company that Raynor was not entitled to truck driver's wages. Their agreement was integrated, and as to others with an interest in the agreement means what it says, not what the parties say they intended or what they subsequently agree it means. *Ray v. Eurice,* 201 Md. 115.

Finally, the trial court instructed the jury that it was not to find an accord and satisfaction unless it found "a final agreement between the plaintiff and the defendant by which all disputed claims had been settled with the full and complete understanding by both the plaintiff and the defendant that it was to be a final settlement of disputed claims."

*Mercantile Trust & Deposit Co. v. Rode,* 137 Md. 362, 377, said the law is as the trial judge instructed the jury. It was there pointed out that there will not be an accord unless the creditor accepts a smaller sum than claimed "in full settlement of the claim, and such an agreement will not be inferred from the mere fact that the creditor accepts part of the claim. * * *" There was no evidence that Food Fair tendered the salary checks as in full settlement of a disputed claim and there was evidence that Raynor never was satisfied with the raise he got and did not accept his pay checks in settlement of his claim to more. He said he took his pay because "I have a family with three children. I could not quit my job." It would be unrealistic in the extreme to hold, as a matter of law, that an employee who had plainly shown that he was dissatisfied with receiving only a small percent-

age of the amount he sought had released his claim by accepting his weekly pay check which he needed in order to live and support his family.

We find no prejudicial error below.

*Judgment affirmed, with costs.*