FRANCIS A. DONNELLY, PLAINTIFF-APPELLANT, v. UNITED
FRUIT COMPANY, A CORPORATION OF THE STATE OF
NEW JERSEY, AND THE BROTHERHOOD OF MARINE
OFFICERS, LOCAL 13212, DISTRICT 50, UNITED MINE
WORKERS OF AMERICA, AN UNINCORPORATED ASSO-
CIATION, DEFENDANTS-RESPONDENTS.

Argued January 8 and 21, 1963—Decided May 6, 1963.

64

*Mr. Ernest Gross* argued the. cause for plaintiff-appellant (*Messrs. Gross and Weissberger,* attorneys).

*Mr. Willard G. Woelper* argued the cause for defendant-respondent United Fruit Company (*Mr. Anthony J. Iannarone,* on the brief; *Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys).

*Mr. Abraham L. Friedman* argued the cause for defendant-respondent Brotherhood of Marine Officers (*Mr. Samuel L. Rothbard,* of counsel; *Messrs. Rothbard, Harris & Oxfeld,* attorneys).

The opinion of the court was delivered by

FRANCIS, J.  This suit seeks recovery for pecuniary loss suffered by plaintiff, an employee, allegedly as the result of breach of a collective bargaining contract entered into between defendants, employer and union.  The asserted breach

of contract is of a twofold character: (1) discharge of plaintiff by defendant employer in violation of its terms; and (2) failure and refusal of defendants, employer and union, to process plaintiff's claim of unlawful discharge in accordance with the grievance procedure set out in the contract. The Law Division of the Superior Court entered summary judgment against plaintiff, 70 *N. J. Super.* 370 (1961), and the Appellate Division affirmed. 75 *N. J. Super.* 383 (1962). We granted plaintiff's petition for certification. 38 *N. J.* 316 (1962).

Plaintiff, Francis A. Donnelly, had been employed by defendant United Fruit Company as an assistant purser (a staff officer) for about four years prior to April 7, 1955. During that period he was a member of defendant labor union, Brotherhood of Marine Officers, Local 13212, District 50, United Mine Workers of America. Prior to the events which produced this litigation, United Fruit and the union had executed a contract which recognized the union as the exclusive representative of all staff officers employed on American flag vessels operated by the company, and which set forth the stipulations of the parties respecting wages, hours and conditions of employment. The agreement reserved to United the right to discharge an employee "for cause," and contained a clause banning discrimination by the employer against any member of the union.

The usual subject of grievances and arbitration was covered by the contract. It provided in Article XI:

"In the event of any dispute or controversy arising during the life of this Agreement, the Staff Officers will continue to work pending an adjustment of the trouble as follows:

Matter in dispute to be submitted to a Committee of four (4), two (2) of whom shall be representatives of the Brotherhood and two (2) of the Company; a decision of a majority of this Committee to be final and binding. In the event of failure on the part of the Committee of four (4), to reach an agreement, they shall proceed to select a fifth man as Chairman, which man must be satisfactory to both sides and the decision of a majority of this Committee so augmented shall be final and binding upon the parties signatory to this Agreement."

On April 3, 1955 Donnelly completed a voyage as assistant purser on the S. S. *Fra Berlanga*. On April 7 United notified him that his services were no longer required. On inquiry as to the reason for the discharge, he was told that it was his inefficiency. Donnelly then consulted Edward J. Farr, the secretary-treasurer of the union to whom the union had delegated the investigation and processing of grievances. He informed Farr of his difficulty and asked him to take the steps necessary under the bargaining agreement to · bring about reinstatement.

There seems to be no substantial . doubt that Farr conducted an investigation of the matter and of the company's claim that the dismissal was for just cause. It is clear also that officers of United were consulted as well as fellow employees of Donnelly. Moreover, Farr and a vice-president of the union conferred with representatives of United who explained the causes leading to the discharge. Whether that conference was the first formal step in the grievance procedure, *i. e.*, the committee of four consideration of the matter, cannot be said with certainty. The record gives the impression that it was part of the union's informal investigation rather than pursuit of an actual step in the formal grievance process. In any event, Farr became satisfied that the discharge was for proper cause and declined to pursue the matter further, advising Donnelly that he had "no case." Subsequently, there were some additional meetings between Farr and Donnelly, and Farr and a United representative. But nothing came of them, and union and employer closed the matter, Farr telling plaintiff neither the union nor the company would proceed to arbitration.

On September 28, 1955 plaintiff submitted a letter of resignation to United through Farr. According to Donnelly's alleged understanding with Farr, delivery of the letter was to be conditional upon obtaining from United a good letter of recommendation which would enable him to secure employment elsewhere. .A letter of recommendation was given by the company but it was not satisfactory to Donnelly.

Accordingly, he renewed his request for arbitration but Farr refused. Thereafter, Donnelly was unemployed for substantial periods until April 3, 1958 when he received an appointment from another employer as an assistant junior purser, a position of lower grade than he had held with United.

On November 23, 1956 Donnelly instituted a declaratory judgment proceeding in the New York Supreme Court against United alone. There he sought, among other things, a declaration that his discharge was improper and that he had not been inefficient or insolent to the ship's master. United obtained summary judgment in its favor, which disposition was entered without prejudice. It is contended in the present case that the New York judgment is *res judicata*. Our Appellate Division held to the contrary. 75 *N. J. Super.*, at *p.* 391. We agree and find no need for further discussion of the issue.

In November 1958 this damage action was brought in the Superior Court, Law Division, against United and the union. The claim against United was predicated on an alleged wrongful discharge from employment, and on a refusal to arbitrate the propriety of the discharge, all in violation of the collective bargaining agreement between United and the union. As to the union, the charge was improper refusal to seek and obtain arbitration of plaintiff's wrongful discharge grievance as it should have done under the bargaining contract.

The suit was removed to the United States District Court and then remanded to the Law Division where, following pretrial conference, cross-motions for summary judgment were made by the parties. The motions were presented on the pleadings, affidavits, interrogatories and deposition of plaintiff in this case, as well as on the pleadings and other pertinent papers in the New York case. The trial court granted summary judgment for both defendants on the grounds, (1) that under *Marchitto v. Central R. R. Co. of N. J.*, 9 *N. J.* 456 (1952), the complaint did not state a claim

against the union on which relief could be granted; and (2) that the collective bargaining agreement conferred no individual right on plaintiff to insist that the union proceed to have his grievance processed in accordance with the union-management contract.

## I.

In *Marchitto*, plaintiff was a member of the Brotherhood of Railroad Trainmen, and in the employ of Central Railroad of New Jersey as a switchtender. The Brotherhood had a collective bargaining agreement with the railroad under which plaintiff claimed he was entitled to extra wages and certain seniority rights. He sued the Brotherhood for damages alleging a willful and fraudulent failure to prosecute his claims through the grievance procedure created by the contract, thereby breaching its duty of trust to him. The trial court dismissed the complaint for failure to state a cause of action and this court affirmed.

The Supreme Court opinion pointed out that the Brotherhood was an unincorporated association, having no separate existence apart from its individual members, and not suable as an entity at common law. In legal effect, the court said, plaintiff and every other member were coprincipals linked together in a joint enterprise to accomplish a common purpose with their relationships to each other and to the group being governed by the association's constitution and bylaws, and by the common law. As a member of the group plaintiff was held to be jointly responsible with all other members for the actions of the group itself, and therefore as a principal he could have no cause of action against his coprincipals for the wrongful conduct of their common agent. 9 *N. J.*, at *pp.* 466, 467.

At the time of *Marchitto*, New Jersey, like many other states, had a statute, *N. J. S.* 2A:64–1, which authorized suit against unincorporated associations consisting of seven or more persons, and having recognized names "in any civil

action affecting its common property, rights and liabilities, with the same force and effect as regards such common property, rights and liabilities as if the action were prosecuted by or against all the members thereof." The common assets of the association were made subject to levy on a judgment obtained in such an action. *N. J. S.* 2A:64-3. If the judgment was unsatisfied in whole or in part, the membership remained liable as at common law. *N. J. S.* 2A:64-4. It was provided also that the bringing of the suit against the entity on a claim for which the members are personally liable would not bar prosecution thereof against the members. The Legislature declared further that the act should not be construed to give an association "any of the powers or to impose any of the liabilities of a corporation, except as herein set forth." *N. J. S.* 2A:64-5.

In passing upon the application of this statute in *Marchitto,* the court regarded it as simply providing a procedural device to permit suit in a proper case against the organization by name. And the court held that no change was brought about thereby in substantive rights or liabilities. Therefore, since a principal cannot sue his coprincipal for a dereliction of their common agent, and since the statute did not expressly or impliedly change the substantive nature of that doctrine, Marchitto had no cause of action. 9 *N. J.,* at *pp.* 466-467.

■■ As the Appellate Division observed in the present case, the *Marchitto* doctrine has been criticized. 75 *N. J. Super.,* at *pp.* 393, 394; 9 *Rutgers L. Rev.* 127, 140 (1954); 13 *Rutgers L. Rev.* 631, 632 (1959). The mists of the conceptual world of the early common law should not be allowed to obscure the public interest in imposing liability on a union as a juristic entity for torts and contract breaches committed against one or more of its own members. See *United Mine Workers of America v. Coronado Coal Company,* 259 *U. S.* 344, 42 *S. Ct.* 570, 66 *L. Ed.* 975 (1922). In modern industrial society, the restrictive principle of *Marchitto* ignores reality. Unions have become endowed with great privileges and responsibilities as representatives of their members.

Existence of such privileges must be accompanied by a correlative duty not to misuse them to the injury of individual union members. Immunity from liability for misuse is inconsistent with basic notions of justice. The statute, *N. J. S.* 2A:64–1, is remedial legislation and ought to be given as liberal an interpretation as possible consistent with its language. In our judgment, study of the entire enactment reasonably justifies the view that the intention was to create substantive remedies as well as procedural rights. More specifically, the purpose was not only to authorize suit against the association as an entity in cases where tortious or contractual wrongs were inflicted by its agents upon individual members, but also to make the assets of the entity available for the payment of any judgment resulting from such action. *Cf. Marshall v. International Longshore. & W. U. Local 6,* 57 *Cal.* 2d 781, 22 *Cal. Rptr.* 211, 371 *P.* 2d 987 (*Sup. Ct.* 1962); *Fray v. Amalgamated Meat Cutters, etc.,* 9 *Wis.* 2d 631, 101 *N. W.* 2d 782 (*Sup. Ct.* 1960).

In *Marshall v. International Longshore. & W. U. Local 6, supra,* the Supreme Court of California had this to say of the *Marchitto* doctrine:

"When these concepts are transferred bodily to other forms of voluntary associations such as fraternal organizations, clubs and labor unions, which act normally through elected officers and in which the individual members have little or no authority in the day-to-day operations of the association's affairs, reality is apt to be sacrificed to theoretical formalism. The courts, in recognition of this fact, have from case to case gradually evolved new theories in approaching the problems of such associations, and there is now a respectable body of judicial decision, especially in the field of labor-union law, with which we are here directly concerned, which recognizes the existence of unincorporated labor unions as separate entities for a variety of purposes, and which recognizes as well that the individual members of such unions are not in any true sense principals of the officers of the union or of its agents and employees so as to be bound personally by their acts under the strict application of the doctrine of respondeat superior." 22 *Cal. Rptr.,* at *p.* 213, 371 *P.* 2d, at *p.* 989.

We concur in those observations with respect to labor unions, the only aspect of the problem now before us. More-

over, as to labor unions, they and the similar construction we would place on the scope of *N. J. S.* 2A:64–1 *et seq.* are in harmony with existing federal policy to be discussed hereafter. Accordingly, *Marchitto* is overruled and can no longer be regarded as the law of this State. No view is expressed as to whether the common law doctrine described in *Marchitto* or the effect of *N. J. S.* 2A:64–1 *et seq.* as applied therein, should receive continued recognition in cases involving voluntary associations generally.

In 1947, Congress adopted the Labor Management Relations Act, 29 *U. S. C. A.* § 141 *et seq.*, section 301 which provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." Section 301(a).

Section 301(b) prescribes that a labor organization subject to the statute shall be bound by the acts of its agents, and may sue or be sued as an entity. A money judgment obtained in such a suit may be enforced only against the assets of the organization and is not enforceable against any individual member or his assets. 29 *U. S. C. A.* § 185(a) and (b).

The Congressional intention manifested by Section 301 was to eliminate the amorphous status of the union, and to personify it as a jural entity. For purposes of suits for breach of collective bargaining contracts in industries affecting commerce, rights and liabilities, which under the common law vested distributively in or were so imposed upon the members of a union, were by this enactment vested in or imposed upon the union. Substantive rights were created thereby and enforceable as such. *Textile Workers Union v. Lincoln Mills*, 353 *U. S.* 448, 456, 457, 77 *S. Ct.* 912, 917, 918, 1 *L. Ed.* 2d 972, 980–981 (1957); *Dowd Box Co. v. Courtney*, 368 *U. S.* 502, 82 *S. Ct.* 519,

7 *L. Ed. 2d* 483 (1962); *Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co.,* 369 *U. S.* 95, 104, 82 *S. Ct.* 571, 577, 7 *L. Ed. 2d* 593, 599–600 (1962); *Schatle v. International Alliance, etc.,* 182 *F. 2d* 158, 164 (9 *Cir.* 1950), *cert.* denied 340 *U. S.* 827, 71 *S. Ct.* 64, 95 *L. Ed.* 608 (1950); *Waialua Agr. Co. v. United Sugar Workers,* 114 *F. Supp.* 243, 246 (*D. C. Hawaii* 1953); *Textile Workers Union of America v. Aleo Mfg. Co.,* 94 *F. Supp.* 626, 628 (*D. C. N. C.* 1950); *Wilson & Co. v. United Packinghouse Workers,* 83 *F. Supp.* 162, 166 (*D. C. S. D. N. Y.* 1949); Annotation, 99 *L. Ed.* 529, 531–535 (1955); Sovern, "Section 301 and the Primary Jurisdiction of the NLRB," 76 *Harv. L. Rev.* 529, 537 (1963). According to the United States Supreme Court:

"\* \* \* A principal motive behind the creation of federal jurisdiction in this field was the belief that the courts of many States could provide only imperfect relief because of rules of local law which made suits against labor organizations difficult or impossible, by reason of their status as unincorporated associations." *Dowd Box Co. v. Courtney, supra,* 368 *U. S.,* at *p.* 510, 82 *S. Ct.,* at *p.* 524, 7 *L. Ed. 2d,* at *p.* 489.

And as the court said in *Waialua Agr. Co. v. United Sugar Workers, supra:*

"State laws \* \* \* providing that the action could be maintained only if all the members of the union were jointly and severally liable do not apply; the substantive law to be applied would not be that of the State, and these provisions are irrelevant in the federal action. Subsection (b) of section 185, \* \* \* when it imposes liability on the union sued for money judgments as an entity (where such liability did not exist before), when it removes the common liability from the individual members (which liability did exist before, if members were properly served), and when it provides capacity in the union to sue or be sued, declares federal rights and liabilities in these circumstances." 114 *F. Supp.,* at *p.* 246.

■ Jurisdiction to enforce these new substantive rights and remedies, however, is not limited to the federal courts. State courts have concurrent authority, "the basic purpose of § 301(a) [not being to limit], but to expand, the avail-

ability of forums for the enforcement of contracts made by labor organizations." *Dowd Box Co. v. Courtney, supra,* 368 *U. S.,* at *pp.* 508–509, 82 *S. Ct.,* at *p.* 523, 7 *L. Ed. 2d,* at *p.* 488. But federal law is paramount and in case of conflict the state must give way. *Local* 174, *Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Lucas Flour Co., supra,* 369 *U. S.,* at *pp.* 102–104, 82 *S. Ct.,* at *pp.* 576–577, 7 *L. Ed. 2d,* at *pp.* 598–599.

██ It is obvious from the foregoing that the doctrine of *Marchitto v. Central R. R. Co. of N. J.* is incompatible with the underlying policy of section 301. Since United is concededly engaged in a business affecting commerce and therefore subject to the Labor Management Relations Act, *Marchitto* must step aside not only because it is no longer the law of New Jersey but also because of the provisions of section 301 of the federal act. Under the circumstances, the dismissal of the suit against the union because of that decision was erroneous.

## II.

Once the problem of suability of a labor organization for the claim asserted in the complaint is resolved, the basic issue in the case is whether plaintiff has shown a violation of the collective bargaining agreement between defendants affecting an individual right of his thereunder which may be redressed in this action.

██ A union selected as a bargaining agent by a majority of employees (in an appropriate unit) of an employer, in an industry affecting commerce, becomes the exclusive representative of all the employees in the unit for the purpose of collective bargaining with respect to wages, hours and conditions of employment. Labor Management Relations Act, § 9(a), 61 *Stat.* 143 (1947), 29 *U. S. C. A.* § 159(a). The exclusiveness of the agency exists whether the relations between the employer and union are conducted on an open, agency or union shop basis. The powerful role carries with

it the responsibility of exercising the utmost good faith toward all employees represented, union and non-union, in negotiating a collective bargaining agreement with the employer, and in administering the agreement during its lifetime. The union-management compact becomes the code of the plant, and in policing it the union has the duty of treating all employees fairly, particularly with respect to employment of procedures established therein to adjust and settle their individual grievances.

Congress has not been insensitive to the need for staunch devotion by the union to the interests of employees in the prosecution of their grievances against the employer. Aside from the fiduciary obligation implicitly imposed on the union as a result of the statutory grant of exclusive agency, the lawmakers provided additional means in § 9(a) of the Labor Management Relations Act to protect and further the interests of the individual employee in the adjustment of personal grievances against the employer. The proviso, which will be treated more fully hereafter, says:

"* * * any individual employee or a group of employees shall have the *right* at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective bargaining contract or agreement then in effect. Provided further, That the bargaining representative has been given opportunity to be present at such adjustment." (Emphasis added)

The issues in the present case cannot be resolved without giving recognition to the obvious interrelationship between sections 9(a) and 301(a) of the act. Until recently the lower federal courts generally declined to accept jurisdiction under section 301(a) of suits by individual employees against either the employer or labor union for breach of a collective bargaining contract. Actions for such breaches were limited to parties to the contract—namely, the employer and labor organization. Annotation, 7 *L. Ed. 2d* 959, 978 (1962); 2 *CCH Labor Law Rep.*, Labor Relations,

par. 3255; and see, *Allen v. Armored Car Chauffeurs & Guards Local Union,* 185 *F. Supp.* 492 (*D. C. N. J.* 1960). But in December 1962 the United States Supreme Court held otherwise in *Smith v. Evening News Association,* 371 *U. S.* 195, 83 *S. Ct.* 267, 9 *L. Ed.* 2d 246 (1962); see also, *Belk v. Allied Aviation Service Co. of New Jersey,* 315 *F.* 2d 513 (2 *Cir.* 1963); *Cross v. Hoffa,* 368 *Mich.* 671, 118 *N. W.* 2d 991, 993 (*Sup. Ct.* 1962). Among other things, the Supreme Court said:

"* * * The rights of individual employees concerning rates of pay and conditions of employment are a major focus of the negotiation and administration of collective bargaining contracts. Individual claims lie at the heart of the grievance and arbitration machinery, are to a large degree inevitably intertwined with union interests and many times precipitate grave questions concerning the interpretation and enforceability of the collective bargaining contract on which they are based. To exclude these claims from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law. This we are unwilling to do." 371 *U. S.,* at *p.* 200, 83 *S. Ct.,* at *p.* 270, 9 *L. Ed.* 2d, at *p.* 251.

Moreover, the court declared the federal pre-emption doctrine was not applicable and such suits were cognizable both in state and federal courts. 371 *U. S.,* at *pp.* 196, 197, 83 *S. Ct.,* at *pp.* 268, 269, 9 *L. Ed.* 2d, at *p.* 249. It was made plain, however, that in their adjudication, federal substantive law as established by the Labor Management Relations Act, the Congressional policy exhibited thereby, and the decisions of the United States courts thereunder would be controlling, and incompatible state doctrines could not be applied (371 *U. S.,* at *pp.* 198–201, 83 *S. Ct.,* at *pp.* 269–271, 9 *L. Ed.* 2d, at *pp.* 250–251), citing *Dowd Box Co. v. Courtney, supra,* and *Local 174, Teamsters, Chauffeurs, etc. v. Lucas Flour Co., supra.* See also, Sovern, *supra* (76 *Harv. L. Rev.,* at *p.* 573); Hagan, "Concurrent Jurisdiction under Section 301(a) of the Taft-Hartley Act," 36 *Temp. L. Q.* 211 (1963). But state law, if compatible with the purpose of § 301 may be resorted to in seeking a rule that will best

effectuate federal policy, and when applied will be drawn into the developing body of federal law. *Textile Workers Union v. Lincoln Mills, supra* (353 *U. S.,* at *p.* 457, 77 *S. Ct.,* at *p.* 918, 1 *L. Ed. 2d,* at *p.* 981).

The *Smith* opinion did not delineate the scope of enforceable individual rights under a labor-management contract regulating wages, hours and conditions of employment. More specifically, no issue was presented there respecting the grievance clause of such a compact, its breach by the union or the employer, or the legal effect of their refusal of the employee's demand to process in accordance with the contract his alleged improper discharge grievance. As *Smith* pointed out, however, section 301 has been applied to suits by unions to compel arbitration of such individual grievances as rates of pay, hours of work and wrongful discharge; to obtain specific enforcement of an arbitrator's award for reinstatement and back pay to individual employees; and to recover wage increases in a contest over the validity of the bargaining contract. 371 *U. S.,* at *pp.* 198–201, 83 *S. Ct.,* at *pp.* 269–271, 9 *L. Ed. 2d,* at *pp.* 250, 251.

*Textile Workers Union v. Lincoln Mills, supra, Dowd Box Co. v. Courtney, supra, Local 174, Teamsters, Chauffeurs, etc. v. Lucas Flour Co., supra,* as well as *Smith,* make it plain that the Supreme Court regards the law respecting the scope of actions in federal and state courts under § 301 as in the development stage. The court declared that the substantive law to be applied must be fashioned from the policy of the national labor laws. Where a particular problem is not controlled by express statutory sanction, it must be solved by "looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem." *Textile Workers Union v. Lincoln Mills, supra* (353 *U. S.,* at *pp.* 456, 457, 77 *S. Ct.,* at *pp.* 917, 918, 1 *L. Ed. 2d* 972). Settlement of grievances in present-day industrial society by means of arbitration mechanisms established in collective bargaining contracts is highly favored

by courts and legislatures. 29 *U. S. C. A.* § 173(d);
*United Steelworkers of America v. Warrior & Gulf Nav. Co.,*
363 *U. S.* 574, 581, 80 *S. Ct.* 1347, 1352, 4 *L. Ed. 2d* 1409,
1416–1417 (1960); *Jersey Central Power & Light Co. v.
Local Union No. 1289, etc.,* 38 *N. J.* 95, 103–04 (1962).
Such contracts are treaties of peace, and the arbitration pro-
visions therein represent the system of government through
the medium of which grievances are to be resolved, and the
peace maintained. Katz, "Minimizing Disputes Through the
Adjustment of Grievances," 12 *Law & Contemp. Prob.* 249
(1947). The system is "designed to aid management in
its quest for efficiency, to assist union leadership in its
participation in the enterprise, and to secure justice for the
employees." *Textile Workers Union v. Lincoln Mills, supra,*
353 *U. S.,* at *p.* 463, 77 *S. Ct.,* at *p.* 924, 1 *L. Ed. 2d,* at *p.*
984 (dissent). Thus, it seems reasonable to say that in the
evolution of the law under section 301, all aspects of arbitra-
tion, whether the particular interest involved is that of the
individual or group, should and will receive liberal judicial
treatment to the fullest extent consistent with the federal
labor policy as revealed in the Labor Management Relations
Act.

## A.

Thus oriented, we come to a consideration of the nature
of a right of an employee-union member to have his in-
dividual grievance determined under the arbitration pro-
visions of the contract between the employer and the union.
Facets of the problem are (1) the scope of the union's ob-
ligation under the contract to process his claim of discharge
without just cause, (2) the employee's right, if any, as an
individual to insist that the union, as the exclusive statutory
and contractual representative of all the employees, invoke
the grievance procedure in aid of his claim of improper
discharge, and (3) whether in the face of a refusal by the
union to pursue the grievance procedure in his behalf, an
employee has a right under, or by virtue of, the bargaining

agreement to process the grievance himself through to arbitration.

As we have said, a labor union which becomes the exclusive bargaining representative of employees under the Labor Management Relations Act is vested with extensive powers over their welfare. § 9(a), *supra*. But power and responsibility are the two sides of a single coin. A union cannot acquire one without assuming the other. In accepting recognition as the bargaining representative of the group, it accepts a trust. *Hughes Tool Co. v. N. L. R. B.*, 147 *F*. *2d* 69, 74, 158 *A. L. R.* 1165 (5 *Cir*. 1945). Accordingly, in negotiating a contract and in policing it afterward, a duty exists to provide fair and impartial treatment for the interests of all employees. The statutory obligation to represent all members of the appropriate employee unit requires complete good faith and honesty of purpose. *Ford Motor Co. v. Huffman*, 345 *U. S.* 330, 73 *S. Ct.* 681, 97 *L. Ed.* 1048 (1953); *Steele v. Louisville & N. R. R. Co.*, 323 *U. S.* 192, 65 *S. Ct.* 226, 89 *L. Ed.* 173 (1944); *Gainey v. Brotherhood of Railway & Steamship Clerks, etc.*, 313 *F. 2d* 318 (3 *Cir*. 1963); *National Labor Relations Board v. Gaynor News Co.*, 197 *F. 2d* 719 (2 *Cir*. 1952), affirmed *Radio Officers Union of Commercial Telegraphers Union, A. F. L. v. N. L. R. B.*, 347 *U. S.* 17, 74 *S. Ct.* 323, 98 *L. Ed.* 455 (1954); *Hughes Tool Co. v. N. L. R. B., supra*; Summers, "Collective Power & Individual Rights in the Collective Agreement," 72 *Yale L. J.* 421, 431–434 (1963).

Invidious conflict of interest is intolerable. Where it appears, the employee is not bound by the action of the union in disposing of his claim against the employer. *Guzzo v. United Steelworkers of America*, 40 *Lab. Cas.*, par. 66,430 (*Cal. Super. Ct.* 1960), *cert.* denied *sub. nom. Smith v. Superior Court*, 365 *U. S.* 802, 81 *S. Ct.* 467, 5 *L. Ed. 2d* 460 (1961); *Pattenge v. Wagner Iron Works*, 275 *Wis.* 495, 82 *N. W. 2d* 172 (*Sup. Ct.* 1957). He may intervene in arbitration proceedings and obtain independent representation, if the union is acting adversely to his interests as they

appear in, or derive from, the collective bargaining contract. *Clark v. Hein-Werner Corp.*, 8 *Wis.* 2d 264, 99 *N. W.* 2d 132 (*Sup. Ct.* 1959), rehearing denied 8 *Wis.* 2d 264, 100 *N. W.* 2d 317 (*Sup. Ct.* 1960), *cert.* denied *Local* 1377 *of International Association of Machinists, A. F. L. - C. I. O. v. Hein-Werner Corp.*, 362 *U. S.* 962, 80 *S. Ct.* 878, 4 *L. Ed.* 2d 877 (1960); see also, *Jenkins v. Wm. Schluderberg-T. J. Kurdle Co.*, 217 *Md.* 556, 144 *A.* 2d 88 (*Ct. App.* 1958); *Alabama Power Co. v. Haygood*, 266 *Ala.* 194, 95 *So.* 2d 98 (*Sup. Ct.* 1957); *contra, In re Soto*, 7 *N. Y.* 2d 397, 198 *N. Y. S.* 2d 282, 165 *N. E.* 2d 855 (*Ct. App.* 1960); *Parker v. Borock*, 5 *N. Y.* 2d 156, 182 *N. Y. S.* 2d 577, 156 *N. E.* 2d 297 (*Ct. App.* 1959). On the other hand, if a union at the request of an employee prosecutes his claim of improper discharge fairly and impartially through the various steps of the grievance machinery set forth in the collective bargaining agreement, the result is binding on all parties concerned.

But what are the rights of the employee under the contract when the union declines to process the discharged employee's grievance? His livelihood, his economic life, are at stake. The function of a bargaining agreement is not only to stabilize union-management relations; it also adjusts substantial job interests of the employees. If the protection of those employees' interests is left wholly to the unlimited discretion of the union, then in a particular situation an important part of the security the employee hoped to gain by union membership, and which on the face of the bargaining contract he appeared to have gained, might be lost without a fair opportunity to defend himself or to realize upon the benefits granted to him by the contract. And such loss would occur even though the union acted in good faith in declining to use the grievance procedure to contest the validity of his discharge from employment. Summers, "Individual Rights in Collective Agreements and Arbitration," 37 *N. Y. U. L. Rev.* 362, 391–95 (1962).

It is true the employee is not a nominal or formal party to a collective bargaining agreement. But the rights, duties

and benefits of his employment are so created and controlled by the agreement made in his behalf by his statutory representative, the union, that for some purposes, at least, he ought to be regarded as a third-party beneficiary in substance as well as in spirit, or as possessing independent rights under section 9(a) of the Labor Management Relations Act, *supra*, which ought to be considered as part of every such contract by operation of law. In this connection, for conceptual purposes it is not amiss to revert to the common law notion of the amorphous character of an unincorporated association, such as a labor union. So considered, it lacks jural personality; it does not exist apart from its members. A contract in its assumed business name is the agreement of all of its members. That concept of an association and its contracts has some relevance as perspective in evaluating the nature of the labor-management contract and the enforceable personal benefits which flow therefrom to the individual employee.

On the other hand, there is much persuasive force to the suggestion that unions should be left to manage their own households exclusively, so long as in acting as bargaining agent, they proceed fairly and in good faith in asserting the interests of the employees. See, Cox, "Rights Under a Labor Agreement," 69 *Harv. L. Rev.* 601 (1956).

The legislative history of the Labor Management Relations Act of 1947 makes it plain that Congress has been aware of the competing interests focused about employer, employee and union in the collective bargaining process. That history reveals an intention and an effort to harmonize and protect all the interests to the extent that it could reasonably be done compatibly with the dominant motive of putting labor and management on an equal footing at the bargaining table.

In 1935 when the National Labor Relations Act was adopted, section 9(a) provided:

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representative of all the

employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided, That any individual employee or group of employees shall have the right at any time to present grievances to their employer.*" Act of July 5, 1935, c. 372; 49 *Stat.* 449, 453; 29 *U. S. C. A.* § 151 *et seq.* (Emphasis added)

In 1945, the Fifth Federal Circuit Court of Appeals decided *Hughes Tool Co. v. N. L. R. B., supra.* The court distinguished between collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment, "which will fix for the future the rules of the employment for everyone in the unit," and "grievances," which "are usually the claims of individuals or small groups that their rights under the collective bargain have not been respected." Such claims, said the court,

"may involve no question of the meaning and scope of the bargain, but only some question of fact or conduct peculiar to the employee, not affecting the unit. They may, however, raise a question of the meaning of the contract, or present a situation not covered by the contract touching which an agreement ought to be made. In the latter cases it is plain that the representative ought to participate, for bargaining, rather than the mere decision of a case according to the contract, is involved. Attention to grievances is therefore mentioned in Section 2(5) as part of the business of the representative, but Section 9(a) does not give him the *exclusive* right to handle them unless they really involve a bargaining for the unit, or an interpretation of the bargain. On the contrary, it expressly gives each employee or group of employees the right to present their own grievances to the employer. The purpose is to preserve in each employee as a right this direct approach to the employer to secure full consideration of his case." 147 *F. 2d,* at *pp.* 72–73.

See, *In re Norwalk Tire & Rubber Co.,* 100 *F. Supp.* 706 (*D. C. Conn.* 1951). It was held also that the word "present" does not mean simply to call attention to the grievance, or that all prosecution of it must be through the agency of the union. In the context of the statute, a right was conferred on the individual employee to fully prosecute his grievance through all stages and appeals. And establishment of the

right in the employee imposed a correlative duty on the employer to have the grievance heard and determined. *Hughes Tool Co. v. N. L. R. B., supra* (147 *F. 2d*, at *p.* 73) ; *National Labor Relations Board v. North American Aviation,* 136 *F. 2d* 898 (9 *Cir.* 1943) ; *Douds v. Local* 1250, *etc.*, 173 *F. 2d* 764, 772, 9 *A. L. R. 2d* 685 (2 *Cir.* 1949) ; Summers, *supra,* 37 *N. Y. U. L. Rev.*, at *p.* 380 ; Dunau, "Employee Participation in the Grievance Aspect of Collective Bargaining," 50 *Colum. L. Rev.* 731, 742–43 (1950).

Three months after *Hughes,* the United States Supreme Court decided *Elgin, Joliet & Eastern R. Co. v. Burley,* 325 *U. S.* 711, 65 *S. Ct.* 1282, 89 *L. Ed.* 1886 (1945), adhered to on rehearing 327 *U. S.* 661, 66 *S. Ct.* 721, 90 *L. Ed.* 928 (1946). There, 10 employees asserted a back pay claim under the starting-time provisions of the collective bargaining contract between the railroad and the Brotherhood of Railway Trainmen. The Brotherhood grievance committee handled the claim and a settlement was agreed to between it and the employer under which the individual monetary claims were withdrawn in exchange for a revision of the agreement to cover specifically for the future the controversial subject of starting time. 325 *U. S.*, at *p.* 715, 65 *S. Ct.*, at *p.* 1286, 89 *L. Ed.*, at *p.* 1890, *fn.* 5. The employees were not satisfied and asserted they had not authorized such a compromise. The Railroad Adjustment Board, operating under section 3 of the Railway Labor Act, recognized the Brotherhood as the exclusive representative of the employees not only for negotiating collective agreements but also for settling grievances, and accepted the settlement as conclusive. The employees then sued on their original claims in the Federal District Court. The United States Supreme Court ultimately declared that under the policy revealed by the act, the union did not have the exclusive power to settle grievances without the consent of the employees involved. Although the language of the act with respect to the right of the individual employee to deal with the employer and to represent himself before the

Adjustment Board is weaker[1] than that appearing in section 9(a) of the Labor Management Relations Act, the court said it clearly contemplates that his right to "confer" with the management about his own grievance is preserved. A distinction was drawn, as in *Hughes*, between the exclusive authority to negotiate collective agreements and the power to settle grievances. 325 *U. S.*, at *pp*. 733–735, 739–740, 65 *S. Ct.*, at *pp*. 1294–1296, 1297–1298, 89 *L. Ed.* 1900, 1903. And on the basis of the over-all Congressional intent to be drawn from the Railway Labor Act, the court said:

"It would be difficult to believe that Congress intended, by the 1934 amendments, to submerge wholly the individual and minority interests, with all power to act concerning them, in the collective interest and agency, not only in forming the contracts which govern their employment relation, but also in giving effect to them and to all other incidents of that relation. Acceptance of such a view would require the clearest expression of purpose." *Id.*, at *pp*.733–734, 65 *S. Ct.*, at *p*. 1295, 89 *L. Ed.*, at *p*. 1900.

And the opinion concluded:

"The collective agreement could not be effective to deprive the employees of their individual rights. Otherwise those rights would be brought within the collective bargaining power by a mere exercise of that power, contrary to the purport and effect of the Act as excepting them from its scope and reserving them to the individuals aggrieved." *Id.*, at *p*. 744, 65 *S. Ct.*, at *pp*. 1299–1300, 89 *L. Ed.*, at *p*. 1905.

As Professor Summers suggests, the importance of the *Hughes* and *Burley* cases does not lie essentially in their pronouncement of authoritative labor doctrine. They have more significant value as part of the legislative scene in 1947 when section 9(a) was amended to its present form. Summers, *supra*, 37 *N. Y. U. L. Rev.*, at *p*. 383. As noted above, the original act provided that "any individual em-

---

[1] See discussion of pertinent sections of Railway Labor Act, *Elgin, Joliet & Central R. Co. v. Burley*, *supra*, 325 *U. S.*, at *pp*. 729–736, 65 *S. Ct.*, at *pp*. 1292–1296, 89 *L. Ed.*, at *pp*. 1897–1901, and *fns*, 26–29.

ployee or group of employees shall have the right at any time to present grievances to their employer." The amendment added:

"* * * and *to have* such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: Provided further, That the bargaining representative has been *given opportunity to be present at such* adjustment." (Emphasis added)

There is no doubt that these cases figured prominently in the Congressional discussions over the amendment proposal. See Dunau, *supra,* 50 *Colum. L. Rev.,* at *pp.* 744–45.

The Senate Committee Report approving the amendment said:

"The revised language would make it clear that the employee's right to present grievances exists *independently* of the rights of the bargaining representative, if the bargaining representative has been given an opportunity to be present at the adjustment, unless the adjustment is contrary to the terms of the collective-bargaining agreement then in effect." *S. Rep. No.* 105, 80th *Cong., 1st Sess.* 24 (1947). (Emphasis added)

The House Committee Report said the amended bill "permits the employees and the employer to *settle* the grievances." *H. R. Rep. No.* 245, 80th *Cong., 1st Sess.* (1947). (Emphasis added)[2]

---

[2] The Report says:

"* * * The present act provides that any individual employee or group of employees may 'present grievances to their employer.' Putting a strange construction upon this language, the Labor Board says that while employees may 'present' grievances in person, the representative has the right to take over the grievances. The present bill permits the employees and their employer to settle the grievances, but only if the settlement is not inconsistent with the terms of any collective bargaining agreement then in effect. The proviso is thus given its obvious and proper meaning." At *page* 34. And see, *H. R. Rep. No.* 510, 80th *Cong., 1st Sess.* (1947), at *p.* 46, *U. S. Code Congressional Service,* 1947, *p.* 1135.

## B.

■ The evolution of section 9(a) in its present form induces the conclusion that the employee has beneficial rights in the collective bargaining agreement which are not subject to the exclusive control of the union. Those independent rights cannot be bargained away by the employer and the union; they become integrated in the agreement as a matter of legislative policy. Their enforcement, however, is subject to the substantive terms of the agreement, and when an employee utilizes section 9(a) to secure enforcement, the union is entitled to be heard and to insist upon an adjustment conforming to the agreement. The opportunity conferred upon the bargaining representative under section 9(a) "to be present" to be meaningful cannot signify mere presence as an observer. For example, adjustment of a contract breach grievance of an individual may involve an interpretation of the contract to be applied to similar situations in the future. Elemental notions of due process, therefore, would seem to call for such optional presence by the union as will enable it to oppose a settlement inconsistent with the collective agreement. See Dunau, *supra,* 50 *Colum. L. Rev.,* at *pp.* 746–57; Summers, *supra,* 72 *Yale L. J.,* at *pp.* 439–440.

■ From all the foregoing, for purposes of the case before us, we conclude that an individual employee has a statutorily-vested right to present his grievance to, and to have it determined by, his employer when the union declines to process it in his behalf. "Grievance" in this context means a claim by the employee that in the application or administration of the collective agreement his rights thereunder have not been respected. Such a claim is ordinarily distinguished from collective bargaining as to rates of pay, wages, hours and conditions of employment, the purpose of which is to fix the rules of employment for the future. The Second Federal Circuit Court of Appeals indicated a disposition to depart from this dichotomy and to consider section 9(a) as relating to all disputes whatever their nature.

*Douds v. Local* 1250, *etc., supra,* 173 *F.* 2*d,* at *pp.* 771–772. The question was reserved, however, the court saying decision on the point was not necessary because the demand of former striking employees for reinstatement was a "grievance" within the more limited view stated in *Elgin, Joliet & Eastern Railway Co. v. Burley, supra,* 325 *U. S.* 711, 65 *S. Ct.* 1282, 89 *L. Ed.* 1886. By the same token, the matter need not be pursued here as Donnelly's discharge clearly constitutes a grievance. See the criticism of *Douds* in Dunau, *supra,* 50 *Colum. L. Rev.,* at *pp.* 754–57.

■ Thus we are brought to consideration of problems of when and how an employee may present grievances to his employer. Obviously, it should be done in the manner least likely to cause discord in the ordinary management-labor union relations. There is no doubt of the authority of employer and union to channel ordinary disputes into a system of private adjudication by means of their collective bargaining agreement. The form of that compact with respect to grievance procedure usually follows customary practice in the particular industry. As such it represents an integral adjunct of the substantive rights created by the agreement. Therefore, it should be regarded as the exclusive method of adjusting grievances, whether presented by the union or the individual employee under the auspices of section 9(a), unless some improper discrimination against the individual is inherent in the system or is likely to be brought to bear against him in the particular case by employer or union through control of the procedure.

■ This court is committed to the doctrine that suits at law on individual grievances allegedly arising from breach of the collective agreement should not be permitted until the stipulated private avenues of remedy are exhausted. *Jorgensen v. Pennsylvania R. R. Co.,* 25 *N. J.* 541 (1958). True, *Jorgensen* was not concerned with a discharge grievance which the union had refused to process. But the philosophy of the opinion clearly reflects the view that industrial peace can best be maintained by deferring to the private arbitra-

tion process to the greatest possible extent consistent with the contract and accomplishment of justice to the disputants. See *General Drivers, etc., Union No. 89 v. Riss & Co., Inc.,* 372 *U. S.* 517, 83 *S. Ct.* 789, 9 *L. Ed.* 2d 918, 920 (1963); Blumrosen, "Legal Protection for Critical Job Interests," 13 *Rutgers L. Rev.* 631 (1959).

As has been noted above, section 9(a), in bestowing on the employee the right to present his grievance personally and to have it adjusted, forbids an adjustment inconsistent with the collective bargaining agreement. Although the Congressional requirement for consistency was probably concerned primarily with substance rather than procedure, nevertheless it is entirely reasonable to conclude from the legislation that the demanded consistency also contemplated vindication of the employee's substantive right through use of the grievance procedure set forth in the agreement, unless unfeasible. Sound development of the law in this area calls for adherence to the contractual mode of processing grievances by the individual employee, as well as by the union. In our judgment such a Congressional intention floods the four corners of the statute. That view is compatible with the decision of the National Labor Relations Board in *Hughes Tool Co. v. N. L. R. B.,* 56 *NLRB* 981, 982–983 (1944), and on appeal in the Fifth Circuit, *supra,* 147 *F. 2d* 69, 73–74; Dunau, *supra,* 50 *Colum. L. Rev.,* at *pp.* 749–50; and Summers, *supra,* 37 *N. Y. U. L. Rev.,* at *pp.* 386, 399, 400.

Moreover, requiring individual grievances to be handled through to arbitration in accordance with the agreed code of the plant not only will effectuate the Congressional purpose shown in section 9(a), but at the same time will harmonize it with the pattern of procedure commonly followed in labor-management relations. And if, perchance, in a particular case, the necessary impartiality cannot be achieved for the individual employee under the collective agreement, because of the nature or control of one or more of the steps outlined in the grievance mechanism, and the parties cannot

agree upon a substitute measure, judicial inventiveness can be counted on to fill the breach. "The range of judicial inventiveness will be determined by the nature of the problem." *Textile Workers Union v. Lincoln Mills, supra,* 353 *U. S.,* at *p.* 457, 77 *S. Ct.,* at *p.* 918, 1 *L. Ed. 2d* 972. In such situation a proper court "can exercise its vast equitable powers and grant the relief which the circumstances dictate." *(Cf. Cooper v. Nutley Sun Printing Co., Inc.,* 36 *N. J.* 189, 198 (1961); and see, *Textile Workers Union v. American Thread Co.,* 113 *F. Supp.* 137, 141–142 *(D. C. Mass.* 1953)); *i. e.,* such substitutionary *cy-pres* measures as will preserve, as nearly as possible, the procedure established by the collective agreement.

It seems unlikely that the position outlined herein for the protection and prosecution of individual grievances will interfere unduly with normal management-union administration of the collective employee interests. There are few businesses so entirely local that their operations do not affect interstate commerce within the contemplation of section 10 of the Labor Management Relations Act, 29 *U. S. C. A.* § 160; *National Labor Relations Board v. Fainblatt,* 306 *U. S.* 601, 59 *S. Ct.* 668, 83 *L. Ed.* 1014 (1939); *National Labor Relations Board v. Denver Bldg. & Constr. T. Council,* 341 *U. S.* 675, 684, 685, 71 *S. Ct.* 943, 949, 950, 95 *L. Ed.* 1284, 1293 (1951). Thus, our rule accommodates itself with what we discern to be the controlling legislative purpose, *i. e.,* establishment of a uniform body of federal law in this expanding field. It leaves undisturbed the doctrine of immunity of the union from damage suits by employee members for failure or refusal to process grievances, where the failure or refusal is grounded in good faith and fair treatment toward the individual employee. At the same time, it gives necessary recognition to the federal right granted to the employee by section 9(a), but does so within the collective agreement pattern established by management and union.

It seems reasonable to assume from the relatively few reported cases that in the great majority of grievances the

union fulfills its traditional role of guardian of the interests of its members by processing their claims. It is probable, also, that with section 9(a)—rights of individual employees thus implemented, there will be even fewer instances of union abstinence. The suggestion that undue burdens on union and employer will follow from such protection of workers' rights is speculation. Obviously, most grievances are adjusted in the preliminary steps of established procedure; relatively few reach formal arbitration. For example, in the 10 years between 1942 and 1952, in the relationship between Bethlehem Steel Company and United Steel Workers of America, involving more than 75,000 employees, of 17,000 written grievances only 1,000, or an average of 100 a year, were decided finally by an arbitrator. *Chamberlain, Labor,* 243 (1958). And undoubtedly both techniques for, and attitudes toward informal adjustment of disputes have improved in the intervening years. Similar fears were voiced after *Elgin, Joliet & Eastern R. Co., supra,* was decided by the Supreme Court. On reargument, the various railroad brotherhoods suggested that if the decision were not reversed or substantially modified, the "orderly settlement of [grievances] will be impeded to a serious degree," and "a breakdown of grievance handling by employee representatives" would result. The Railway Labor Executives Association said, "the whole process of the orderly adjustment of controversies * * * is now in serious jeopardy." 327 *U. S.* 661, 66 *S. Ct.* 721, 90 *L. Ed.* 928, quoted in the dissent, 327 *U. S.,* at *pp.* 669–672, 66 *S. Ct.,* at *pp.* 724–726, 90 *L. Ed.,* at *pp.* 935–36 (1946). Despite adherence of the court to its decision, the Railway Labor Act remains unchanged; the right of the workman to bring his case to the Adjustment Board with union participation in the proceedings appears to be accepted, and the prophesied results have not materialized. Cases like the present one, governed as they are by the policy of the Labor Management Relations Act, limited as they are under section 9(a) to results consistent with the collective bargaining agreement, and en-

gaged in, as they will be, under the eye of the union, will probably assist rather than prejudice tripartite harmony in labor-management relations. But, assuming the outlined implementation of section 9(a) produces some increase in presentation of grievances, in our judgment collective bargaining is sufficiently resilient to absorb the emphasized individual interest without erosion of its basic structure.

## III.

In administration, the right of the individual to process his grievance must be subject to the principle espoused by this court in *Jorgensen v. Pennsylvania R. R. Co., supra*. That is, initially, for purposes of obtaining reinstatement and back pay or simply back or lost pay where reinstatement is not asked, the individual must pursue or attempt in good faith to pursue the grievance procedure set forth in the collective bargaining contract before seeking a court remedy. *Belk v. Allied Aviation Service Co. of New Jersey, supra*. If the union refuses to handle the matter for him or if it has a conflicting interest, the employee should request the employer to take up the grievance with him according to the contractually-prescribed mode, but with the employee in control of the procedural steps wherever necessary to achieve a just determination. On refusal, recourse may be had to the courts for specific performance of the agreement to process the dispute through to arbitration or, at the option of the employee, for damages suffered by him because of the employer's conduct (for example, discharge without cause) which gave rise to the grievance.

During the argument before us, questions were raised as to where the burden of costs would rest when, in order to obtain relief, an employee finds it necessary to "present" his grievance personally. If the matter is pressed to the final stage of arbitration, decision as to expenses may be left to the arbitrator. Obviously, the union should not be saddled with costs of arbitrating worthless or petty claims of dis-

putatious employees. On the other hand, if the employee is successful and the grievance is one which in the judgment of the arbitrator should have been handled by the union, presumably, costs would follow the course fixed in the collective agreement or usually followed by custom or practice. Further, even if the employee is unsuccessful after arbitration, if his cause is colorable and presented in good faith, and in the judgment of the arbitrator refusal of the union to press it was unfair and arbitrary, he should be relieved of costs. But if he fails and has no colorable claim of a substantial nature, he must shoulder the costs. Such treatment of expenses would be consistent with the existing union-management code of the plant and would serve to integrate further the section 9(a) right of the employee with that code. See Blumrosen, *supra* (13 *Rutgers L. Rev.*, at *pp.* 660, 661); Summers, *supra* (37 *N. Y. U. L. Rev.*, at *pp.* 403–04).

So far as our research has taken us, amended section 9(a), and its impact on the processing of individual grievances in situations like the present one, have received practically no judicial treatment. Undoubtedly, the more recent recognition by the United States Supreme Court of enforceability of individual rights under section 301 of the Labor Management Relations Act will stimulate activity in the area. The novelty of the problem moved us to engage in the somewhat extended discussion set out above. It must be said, however, that the conclusion expressed as to the force of section 9(a) does not aid the plaintiff Donnelly in the factual framework of this case.

At no time did Donnelly seek to present or to process his grievance *pro se*. (*"Pro se"* is used here simply to differentiate individual from union presentation of a grievance. The purpose is not to indicate absence of right in the individual to some manner of assistance or representation when processing his own grievance. *Cf. Hughes, supra*, 147 *F. 2d*, at *p.* 73; *Douds, supra*, 173 *F. 2d*, at *p.* 772.) According to the record, at all times he invoked the agency of the union to attack his discharge and to secure reinstatement.

His pursuit of arbitration was confined to requests to the union to intervene in his behalf under the grievance and arbitration provisions of the collective agreement. He did not make a personal demand upon the employer, United, that he be permitted to present the grievance and if necessary, to take it through the contractually-regulated steps to arbitration. No such demand was made in his New York Supreme Court action, nor was such a remedy sought in the present case. In fact, in the New York suit, the employer's answer contained an alternative motion to stay the proceedings pending arbitration according to the union contract. Donnelly filed an affidavit opposing arbitration, saying that it was too late, that United had waived any such proceeding by its course of conduct, and that since the union had agreed the discharge was just, grievance and arbitration proceedings in which the union would select his representatives would be a "mockery." He did not indicate he would accept United's demand providing he or the court selected impartial representatives to consider and decide the discharge dispute. United had shown no disposition to refuse the processing of the claim of unlawful discharge, if the union demanded it. Whether there would have been a refusal to proceed with Donnelly presenting his own grievance is not in the case; he did not make such a demand. Under the circumstances, we find no cause of action against United in the record, either pleaded or proved by the affidavits or depositions, for refusal to permit *pro se* processing of Donnelly's claim of discharge without cause.

## IV.

This brings us to the damage claim against United and the union. The claim against United is based upon breach of the clause of the collective bargaining agreement between it and the union forbidding discharges except for good cause. Against the union the charge is wrongful failure and refusal to seek arbitration of the propriety of plaintiff's discharge.

There does not appear to be a joint count in the amended complaint charging both defendants with conspiracy or unlawful concert of action in breach of the bargaining contract, to deny plaintiff the opportunity to have the validity of his discharge arbitrated. Assuming such a charge of joint wrongdoing was alleged, the proof in the record is such that the result we reach would not be different.

If it were not for the provision in the employer-union agreement limiting United's right of discharge to instances of just cause, Donnelly's employment would have been terminable at will. (The language of the first sentence of Article XI set out above that "in the event of any dispute or controversy arising during the life of this Agreement, the Staff Officers will continue to work pending an adjustment of the trouble * * *," does not alter the situation with respect to discharge of an individual for cause. The quoted provision simply bans a strike by staff officers pending arbitration of a dispute.) The compact which circumscribed United's right to sever the employment relation, also limited the method by which a remedy for doing so in violation of the agreement could be obtained by the injured employee. Thus, before recourse could be had to the courts for damages, the form of remedy provided, *i. e.*, the grievance procedure, had to be exhausted. *Jorgensen v. Pennsylvania R. R. Co., supra.*

It is plain from the record that the employer at no time refused to entertain the grievance conformable to the contract. Its representatives cooperated in the investigation, and satisfied the persons delegated by the union to handle grievances that Donnelly was discharged for good cause. The union's conclusion was an independent one and there is no proof that it was induced by improper influence of the employer or by a wrongful conspiracy of union and employer. Accordingly, the cicumstances provide no legal basis for this damage action against United, and the summary judgment in its favor was warranted. Plaintiff can fare no better on his damage claim against the union. We have already said that where the union declines to invoke the grievance pro-

cedure in an alleged improper discharge case, a damage suit does not lie against the employer until a request is made by the employee to process the grievance himself in accordance with the bargaining contract, and the employer refuses to do so. If the employee's individual right under section 9 (a) is to be regarded as integrated with the collective bargaining agreement, then consistency requires the same limitation of the employee's right to institute a damage suit against the union until such a demand by the employee and refusal by the employer have occurred. Concededly, Donnelly took no such step in this case.

Moreover, on the motion for summary judgment, Donnelly has the additional burden of furnishing proof of some probative value showing that the union acted in bad faith in refusing after investigation to demand that the employer proceed to arbitrate the issue of improper discharge through the steps of the grievance procedure. The courts cannot concern themselves with the wisdom of the union's action. The cause of union solidarity and employee morale might have been better served by adherence to the formal contract plan. But so long as the union in good faith exercised an impartial discretion in reaching its decision that there was good cause for the discharge, judicial intervention is impermissible. Our examination of the total proofs submitted, including Donnelly's pretrial deposition, has led us to the conclusion that sufficient evidence of union bad faith toward him to justify reversal of the trial court's summary judgment does not appear.

In passing, we note the Appellate Division placed substantial emphasis on Donnelly's written resignation which was turned over to United by the union representative, allegedly in violation of the conditions imposed on its delivery. We do not reach the question of the effect of that resignation, and consciousness of certain equitable and legal considerations impels us to reserve it to a more appropriate time. Various considerations, not sufficiently developed factually in the record, relating to the effect of the limitation

imposed by Donnelly on the authority of the union agent to deliver the resignation, the duty, if any, of United under the circumstances to inquire as to the specific *quid pro quo* the agent was instructed to demand in return for delivery of the resignation, and possibly equitable factors of the type which moved the court in *Evaul v. Board of Education of City of Camden*, 35 *N. J.* 244 (1961), suggest the need for restraint in giving decisive force to the challenged resignation.

The judgment for both defendants is affirmed. No costs.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.