248 N.J. Super. 351 (1991)
591 A.2d 623
GEORGE BUTEAS AND HELEN BUTEAS, PLAINTIFFS-APPELLANTS,
v.
RARITAN LODGE # 61 F. & A.M., A MASONIC LODGE OF THE STATE OF NEW JERSEY, A NEW JERSEY CORPORATION ALSO KNOWN AS THE MASONIC BUILDING SOCIETY OF PERTH AMBOY, DEFENDANTS-RESPONDENTS, AND OTIS ELEVATOR CO., INC. AND ADVANCE ELEVATOR SERVICE, INC., A NEW JERSEY CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 16, 1991.
Decided May 20, 1991.
*352 Before Judges PRESSLER, DEIGHAN and BAIME.
James Hely argued the cause for appellants (Weiseman Hely, attorneys).
Michael John Stone argued the cause for respondent Raritan Masonic Society (Hoagland, Longo, Oropollo & Moran, attorneys, Alan I. Dunst, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
*353 This appeal raises the issue, not heretofore addressed in this jurisdiction, of whether a member of an unincorporated fraternal association may sue the association in tort. In Donnelly v. United Fruit Co., 40 N.J. 61, 190 A.2d 825 (1963), the Supreme Court, overruling Marchitto v. Central R.R. Co. of N.J., 9 N.J. 456, 88 A.2d 851 (1952), recognized that right in members of unincorporated labor unions but expressly declined to consider whether its holding would extend to members of other unincorporated associations. We are now obliged to address this issue. We hold that N.J.S.A. 2A:64-1 to -6 modifies the common-law doctrine of imputed negligence among joint enterprisers, thus enabling a member of a voluntary association encompassed by that legislation to seek a tort recovery from the association subject to applicable principles of comparative negligence. Accordingly we reverse the judgment n.o.v. by which the trial court vacated the jury's allocation of a percentage of negligence to defendant Raritan Lodge # 61, a Masonic Lodge of the State of New Jersey (lodge), and we reinstate in full the jury's verdict in favor of plaintiffs George and Helen Buteas compensating them for the damages they sustained by reason of George Buteas' fall into the elevator shaft in the lodge's building.
Plaintiff was a long time member of the lodge, which is the owner of a four-story building in Perth Amboy. It occupies the upper floors and rents space on lower floors to other tenants. Until 1984 the building was owned by a separate entity, The Masonic Building Society of Perth Amboy (society). In that year the society, described in the deed as a corporation of New Jersey, conveyed the property to a grantee designated as "Raritan Lodge # 61 F. & A.M., a Masonic Lodge of the State of New Jersey, a New Jersey corporation." The society, however, continued for at least several years thereafter to assume responsibility for the maintenance and operation of the building. As we understand the record, the society was eventually absorbed into the lodge as its building committee. The building *354 committee continued to be chaired by the former society president and continued to manage the building. In 1989 the society executed a corrective deed, describing both the grantor society and the grantee lodge as unincorporated associations.
The accident which is the subject of this suit, occurred on April 15, 1986. George Buteas was at that time serving as master of the lodge and had come to the building on lodge business. He intended to use the elevator, access to which was prohibited to non-lodge tenants, in order to reach the upper floor. The elevator was installed in the 1920s when the building was built. It was not originally designed or at any time thereafter modified to be a self-service elevator. It was operated by the lodge members themselves, whose routine use of it required them to gain access to the elevator car by intended emergency procedures. That is, the outer door of the elevator was designed to be opened from the outside only by a trained operator or for emergency reasons. The only method of opening the door from the outside was to insert a quarter-inch rod into a small hole by which an interior door lock could be disengaged. The required rods were left in accessible places on all floors of the building for the members' use. The presence of the elevator at a particular floor could be observed through a glass portion of the door prior to the door being opened. Insofar as we can determine from the record, that procedure had been employed since the elevator was first installed. On the day in question Buteas used the rod to open the door. Failing to observe that the elevator was not there, he stepped into the shaft, fell to the basement level, and sustained head injuries.
As the litigation was finally postured by way of amended pleadings, plaintiffs sought recovery from defendant Advance Elevator Service, Inc., which had, since 1984, performed regular inspection, repair and maintenance services on the elevator under a contract executed by the president of the society. Plaintiffs also sought recovery from the lodge, designated in the complaint as "a New Jersey corporation also known as the *355 Masonic Building Society of Perth Amboy." In both its original and amended answers the lodge referred to itself as "The Masonic Building Society of Perth Amboy (improperly pleaded as Raritan Lodge # 61 F. and A.M.)." The pleadings, which were closed before the execution of the corrective deed, never raised any question as to the asserted corporate status of either the lodge or the society.
At trial plaintiffs presented both their liability and damages proofs. When they rested, defendant lodge raised for the first time the issue respecting its unincorporated status, counsel asserting that he had only learned the night before of the corrective deed describing the lodge as an "unincorporated association." He moved for dismissal of the complaint against the lodge on the ground that plaintiff George Buteas' membership precluded the action under the common-law doctrine, derived from partnership law, that a voluntary association is immune from suits by its members because the members are engaged in a joint enterprise in which each is deemed to be both the principal and agent of every other. Thus the negligence of each is imputed to all. The trial judge denied the motion on the ground that plaintiffs, having been completely surprised thereby, had not had an adequate opportunity to respond to it. Defendants accordingly presented their proofs and the matter was submitted to the jury. The jury returned a damages verdict of $265,000, allocating 30% negligence to plaintiff, 23% to the lodge and 47% to Advance Elevator.
Following the return of the verdict, defendant lodge moved for judgment n.o.v. on the imputed-negligence ground. This time the motion was granted, the judge concluding that he was not at liberty to modify the common law in view of what he perceived to be the Supreme Court's equivocal expressions in Marchitto and Donnelly, supra. The judge then proportionately allocated the lodge's 23% of negligence between plaintiff and Advance Elevator, increasing their respective shares to 39% and 61%. Plaintiffs appealed. Advance Elevator has not participated in the appellate proceedings.
*356 Resolution of the imputed-negligence claim made here requires a historical context. We agree with the trial court's observation that at common law a member of a voluntary association was burdened with imputed liability, precluding his recovery against both the association and its members for harm negligently inflicted upon him by any other member. The ancient doctrine, as stated by Marchitto, supra, 9 N.J. at 466-467, 88 A.2d 851, is that:
In legal effect the plaintiff and every other member of the brotherhood are co-principals joined together in a joint enterprise to accomplish a common purpose with their relationships to each other and to the group being governed by the association's constitution and the by-laws or rules adopted pursuant thereto, and by the common law. As a member of the group the plaintiff is jointly responsible with all other members for the actions of the group itself, and accordingly as a principal he has no cause of action against his co-principals for the wrongful conduct of their common agent.
The logical converse of this principle is that since each member of the association is at least vicariously responsible for the wrongful conduct of every other member, each is liable to third persons injured by another member's wrongful conduct. In addition to these substantive rules, there was also a significant common-law procedural consequence attendant upon the voluntary association structure. As explained by Marchitto, supra, at 466, 88 A.2d 851, the voluntary association was not considered a separate jural entity since it had "no existence apart from its individual members. At common law it could neither sue nor be sued."
The common law was modified by the Legislature by its enactment early in this century of L. 1903, c. 247, presently codified as N.J.S.A. 2A:64-1 to -6. This legislation requires close analysis. In its significant provisions, it constitutes every voluntary association "consisting of 7 or more persons and having a recognized name" as a jural entity having the capacity to sue and be sued, N.J.S.A. 2A:64-1, and designates its officers, agents, managers or other persons in charge of its affairs as its agents for receiving process, N.J.S.A. 2A:64-2. And see, so providing, R. 4:4-4(c)(2). It permits execution against the association on a civil judgment "in the same manner as upon a *357 judgment against the corporation," permitting a levy upon its common property. N.J.S.A. 2A:64-3. And if the judgment is not fully satisfied out of common property, it permits an action "to recover the residue thereof against ... such members of the organization or association as may be personally liable." N.J.S.A. 2A:64-4 (emphasis added). Finally, N.J.S.A. 2A:64-5 reserves to any person having a claim against an unincorporated association the right to proceed directly against those of its members who are "personally liable." (emphasis added).
In Marchitto, supra, 9 N.J. at 466, 88 A.2d 851, the Supreme Court initially took the view that N.J.S.A. 2A:64-1 to -6 effected only procedural modifications of the common-law rule, not substantive ones. Thus it concluded that while an unincorporated labor union was subject to suit in its own name as a jural entity, it was nevertheless immunized from liability to its own members by reason of the imputed-negligence component of the common-law joint enterprise doctrine, which, it opined, had survived the statute. The Court, however, took a radically different view in Donnelly, in which it recognized the scholarly criticism which Marchitto had evoked and noted that "[t]he mists of the conceptual world of the early common law should not be allowed to obscure the public interest in imposing liability on a union as a juristic entity for torts and contract breaches committed against one or more of its own members." 40 N.J. at 71, 88 A.2d 851. It reasoned that the statute, as remedial legislation, ought to be given as liberal a construction as possible consistent with its language. Id. at 72, 88 A.2d 851. It then concluded, in sharp contrast to the Marchitto analysis, that "study of the entire enactment reasonably justifies the view that the intention was to create substantive remedies as well as procedural rights." Ibid. The Court consequently held that the statutory "purpose was not only to authorize suit against the association as an entity in cases where tortious or contractual wrongs were inflicted by its agents upon individual members, but also to make the assets of the entity available for *358 the payment of any judgment resulting from such action." Ibid.
It is true that Donnelly limited its holding to labor unions, the Court noting that "[n]o view is expressed as to whether the common law doctrine described in Marchitto or the effect of N.J.S.A. 2A:64-1 et seq. as applied therein, should receive continued recognition in cases involving voluntary associations generally." Id. at 73, 88 A.2d 851. Nor has any reported decision in this jurisdiction considered this reserved question since Donnelly. We are, however, persuaded that as a matter of logical consistency, public policy, statutory construction and conceptual integrity, there is no rational basis for distinguishing labor unions from any other voluntary associations in this respect. We are satisfied that all voluntary associations meeting the criteria of N.J.S.A. 2A:64-1 are liable in negligence to their own members to the same extent to which they are liable to non-members.
We note first that in construing the statute as it did, Donnelly relied substantially on this statement by the California Supreme Court in Marshall v. International Longshoremen's and Warehousemen's Union Local 6, 57 Cal.2d 781, 22 Cal. Rptr. 211, 213, 371 P.2d 987, 989 (1960):
When these concepts [common-law imputed negligence among joint enterprises] are transferred bodily to other forms of voluntary associations such as fraternal organizations, clubs and labor unions, which act normally through elected officers and in which the individual members have little or no authority in the day-to-day operations of the association's affairs, reality is apt to be sacrificed to theoretical formalism.
These observations draw no distinction between labor unions and other voluntary associations, and California does, in fact, apply Marshall to all unincorporated voluntary associations. See, e.g., White v. Cox, 17 Cal. App.3d 824, 95 Cal. Rptr. 259, 261 (Ct.App. 1971).
Nor does the text of N.J.S.A. 2A:64-1 to -6 itself draw any distinction between labor unions and any other voluntary associations. If it is construed as authorizing suits against labor *359 unions by their own members, we see no acceptable basis for not so construing it in respect of any other voluntary association. Moreover, we deem it significant that the statute not only alters the common law, as noted by Donnelly, by constituting voluntary associations as jural entities and making their common property available for satisfying judgments entered against them, but it also insulates from individual responsibility those association members who are not themselves personally liable. We read the phrase "personally liable" as denoting those of the members whose individual conduct gave rise to a plaintiff's tort or contract cause of action. We can see no other meaning to be attached to the statute's distinction between such members and all other members. And subjecting only actively liable members to the onus of responding in damages clearly contravenes the common-law imputed-negligence doctrine.
We note, furthermore, that even aside from the statute, the common-law doctrine has long since been modified by the nearly universally accepted rule that even a member of a joint enterprise who is barred from recovery from the group or from its non-negligent members is not barred from recovery from that member of the group whose negligent conduct resulted in the injury. See 2 Restatement (Second) of Torts, § 491 a & b (1965). Obviously, in a "pure" application of imputed negligence, even that recovery would be barred.
If we were to fail to apply Donnelly to all voluntary associations covered by the statute, we would produce what is in our view a conceptually untenable and anomalous legal doctrine. Despite the common-law joint enterprise theory, we already permit suits by and against voluntary associations in their own name; we subject their common property to process for satisfaction of judgments against them, including judgments in negligence recovered by non-members; we protect non-negligent members from personal responsibility; and we permit victim-members to sue individually culpable co-members. The only vestige of the doctrine we would therefore be retaining is *360 the preclusion of victim-members from recovering from the association itself. We perceive neither a rational nor a jurisprudential basis for what is in the final analysis a wholly arbitrary and unjust result.
The point is, of course, that the common-law joint enterprise doctrine is simply not relevant to the operation and function of a structured voluntary association whose affairs are typically committed by the membership to a management echelon and whose members therefore do not have equal control with all other members over the association's affairs. As explained by the Restatement, supra, § 491 comment b:
A "joint enterprise" is in the nature of a partnership, but is a broader and more inclusive term. In a partnership, there is a more or less permanent business arrangement, creating a mutual agency between the partners for the purpose of carrying on some general business dealings, so that the acts of one are to be charged against the others. A joint enterprise includes a partnership, but it also includes less formal arrangements for cooperation, for a more limited period of time and a more limited purpose. It includes an undertaking to carry out a small number of activities or objectives, or even a single one, entered into by members of the group under such circumstances that all have a voice in directing the conduct of the enterprise. The law then considers that each is the agent or servant of the others, and that the act of any one within the scope of the enterprise is to be charged vicariously against the rest. While it is by no means impossible that the principle may be applied to other activities, the very great majority of the decisions applying it have involved the use of motor vehicles. [emphasis added]
It is at once immediately apparent that the Restatement definition does not encompass a formally organized voluntary association and cannot have been envisioned by it as applicable to such an organization. It is also clear that even in the context of motor vehicle use, the joint enterprise doctrine is generally regarded as largely discredited at least to the extent that it imputes negligence to an innocent victim. See generally W. Prosser and W. Keeton, The Law of Torts § 72 (5th ed. 1984).
In sum, we conclude that in the context of a voluntary association encompassed by N.J.S.A. 2A:64-1, the imputed-negligence doctrine barring suit by a member against the association itself is based on an obsolete legal fiction whose time has long since passed. It serves no useful purpose, results in *361 injustice, and does not advance any public policy. The fundamental principle of tort jurisprudence is that one whose negligent conduct causes foreseeable injury to another is liable for his victim's damages. The identity of the victim is ordinarily irrelevant. Obviously, negligent conduct which renders the association liable to a non-member victim does not become less culpable if the injured victim is a member. Thus the imputed negligence doctrine as applied to voluntary associations arbitrarily protects a tortfeasor from the consequences of its negligent conduct and arbitrarily deprives an injured victim of the opportunity for fair reparation. The relevant issue is not whether the injured party is a member of the association but rather whether his own degree of actual causative negligence, if any, is greater or lesser than that of which he complains.
In this regard, we are aware that the plaintiff-member may in fact bear some degree of actual culpability for the conduct which resulted in his injury by reason of his participation in the management of the association's affairs or in otherwise creating the risk of harm which eventuated in his injury. But a degree of actual culpability provides, in our view, no sound basis for barring him from suit any more than any other form of contributory negligence would. We have in this jurisdiction well-established rules of comparative negligence by which a plaintiff can be held chargeable to the extent his own conduct has contributed to the harm he has suffered. These rules are fully applicable in an action by a member against a voluntary association when the member's negligence, based on his participation in any form in the creation of the risk, may have contributed to his injuries. That participation may result in a reduction of his recovery. It may even preclude recovery if the finder of fact concludes that plaintiff's negligence is greater than 50%. But the mere potential for assessment of a degree of culpability against him cannot bar the action any more than a contributory negligence claim in any other context could.
*362 In reaching our conclusion, we have canvassed the law of other states. Almost all, like New Jersey, have abandoned the common-law imputed-negligence principle in the labor-union context. See generally Annotation, Union's Liability in Damages for Refusal or Failure to Process Employee Grievance, 34 A.L.R.3d 884, 890, 906, §§ 3 and 6 (1970). Most states also permit suits in negligence by members of condominium associations based on the defective condition of the common property. See generally Annotation, Liability of Condominium Association or Corporation for Injury Allegedly Caused by Condition of Premises, 45 A.L.R.3d 1171, 1174, § 4 (1972). The issue of member suits against other voluntary associations has arisen in relatively few jurisdictions, perhaps because most states have legislation similar to N.J.S.A. 2A:64-1 to -6, see Donnelly, supra, 40 N.J. at 70, 190 A.2d 825, and hence it may have been assumed that the cause of action is viable. Ohio, based on legislation similar to ours, has rejected the imputed-negligence doctrine and now permits member actions against voluntary associations. See Tanner v. Columbus Lodge No. 11, Loyal Ord. of Moose, 44 Ohio St.2d 49, 337 N.E.2d 625 (1975). Indiana's Court of Appeals reached a similar conclusion for similar reasons in O'Bryant v. Veterans of Foreign Wars, No. 1552, 176 Ind. App. 509, 376 N.E.2d 521 (Ct.App. 1978), a decision overruled by the Indiana Supreme Court by a three to one vote in Calvary Baptist Church v. Joseph, 522 N.E.2d 371 (Sup.Ct. 1988). South Carolina permits what it terms the affirmative defense of imputed negligence because it has no statute like N.J.S.A. 2A:64-1. See Crocker v. Barr, 295 S.C. 195, 367 S.E.2d 471 (Ct.App. 1988). And Vermont, Wyoming and Pennsylvania continue to find the joint enterprise doctrine persuasive. See Duplis v. Rutland Aerie, No. 1001, Fraternal Order of Eagles, 118 Vt. 438, 111 A.2d 727 (1955); Boehm v. Cody Country Chamber of Commerce, 748 P.2d 704 (1987); De Villars v. Hessler, 363 Pa. 498, 70 A.2d 333 (1950). And see generally Annotation, Recovery by Member from Unincorporated Association for Injuries Inflicted by Tort of Fellow *363 Member, 14 A.L.R.2d 473 (1950). We remain persuaded, however, by Donnelly and what we perceive to be its imperatives.
There are several other matters requiring our attention. The first, not raised by the parties, is the consequence of defendant's late raising of the imputed-negligence theory. Even if plaintiff's membership in the lodge were to constitute a fact having the capacity to defeat the complaint, the question is whether it would be a fact resulting in the failure of the complaint to state a claim on which relief could be granted within the intendment of R. 4:6-2(e) or merely a fact giving rise to an affirmative defense pursuant to R. 4:5-4. For reasons we discuss hereafter the issue is not rendered altogether moot by virtue of our substantive holding which discards the imputed-immunity defense in a tort action against a voluntary fraternal organization covered by N.J.S.A. 2A:64-1.
The distinction between the two rules is significant. An affirmative defense is ordinarily waived if not pleaded or otherwise timely raised. See, e.g., Douglas v. Harris, 35 N.J. 270, 281, 173 A.2d 1 (1961); Brown v. Brown, 208 N.J. Super. 372, 384, 506 A.2d 29 (App.Div. 1986). We have no doubt that the middle of trial is too late for the raising of an affirmative defense where, as here, neither significant public nor constitutional issues are at stake. On the other hand, the defense of failure to state a claim on which relief can be granted is a reserved defense which may be raised at trial. See R. 4:6-7.
We are satisfied that the imputed negligence issue here would have given rise to an affirmative defense rather than a defense under R. 4:6-2(e). The line between the two is not always clearly defined. It is at least evident that a R. 4:6-2(e) defense goes to the legal sufficiency of the pleading, ordinarily connoting the failure of the complaint to state either a cognizable cause of action or all of the elements of a cognizable cause of action. If, for example, N.J.S.A. 2A:64-1 had not been enacted, the complaint here would have failed to state a cause on which relief could be granted since the defendant would not *364 have been a legal entity and its assets would not in any event have been available to satisfy a judgment. That, of course, is not the case here. Plaintiff pleaded a good and sufficient negligence action against a legally cognizable and responsible defendant based on the failure of its duty as a landowner. Consequently, a claim was stated on which relief could have been granted, and this is so despite the fact that an affirmative defense might have been evident from the face of the complaint itself. See 2 Schnitzer & Wildstein, N.J.Rules Service, A IV-247 (1954).
The defense that this defendant was insulated from liability to this plaintiff because of the relationship between them does not go to the legal sufficiency of the complaint. It is rather a matter of avoidance of liability for culpable conduct for which defendant would have been answerable but for the particular facts of the transactional relationship between the parties. That is the essence of an affirmative defense. The imputed-negligence defense is conceptually no different from any other personal immunity, and such immunities are recognized as affirmative defenses required to be pleaded. See, e.g., Kolitch v. Lindedahl, 100 N.J. 485, 497, 497 A.2d 183 (1985) so holding as to governmental immunity. We further note that in theory the defense of imputed negligence is really only an aspect of contributory negligence, another classic and, indeed, specifically enumerated defense. R. 4:5-4. We also note that the Restatement allocates the principles of imputed negligence as a consequence of joint enterprise to its contributory negligence chapter. Restatement, supra, § 491.
We concern ourselves with this distinction for several reasons. First, it provides an alternative ground of decision. That is, even if the imputed negligence defense were theoretically available to this defendant, we are satisfied that it was waived by not having been timely raised. In this respect, we point out that nothing plaintiff did misled defendant. Plaintiff, indeed, was apparently relying on the deed defendant had accepted in determining defendant's associational status. If anything, it *365 was defendant which misled plaintiff. We see no reason, therefore, to relieve defendant of its waiver of the defense. After all, it ought to have known who and what it was.
The late raising of the defense in the context of defendant's identity confusion caused, moreover, unremediated problems of surprise and prejudice for plaintiff. Defendant, as we have indicated, was apparently mistaken about its identify and status throughout the litigation, insisting on denominating itself as the Building Society rather than the Raritan Lodge, a separate entity. But according to the proofs, the Building Society, which had contracted with Advance Elevator in 1984, continued to exercise responsibility for the building for several years after it had conveyed the premises to the lodge and was in fact doing so at the time of the accident. Consequently it might well have been independently liable to plaintiff for a defective condition of the premises. There was, however, never any proof that plaintiff was a member of the society as well as a member of the lodge. The post-verdict judgment n.o.v. deprived him of the opportunity to pursue that avenue of recourse.
Finally, the late raising of a waivable affirmative defense is significant for another reason. As we have indicated, the degree of participation by an injured member of an association in the creation of the risk is an appropriate element of plaintiff's negligence to be considered in his suit against the association. Plaintiff's negligence in this trial was predicated on his alleged carelessness in stepping into the elevator shaft without first making a proper observation. It was apparently not based at all on the fact that as an officer of the lodge, he might have had some degree of responsibility for the perpetuation of the long-standing dangerous condition which had predated his leadership position. But those facts were always available to defendant and could have been used defensively by it irrespective of its belated dismissal motion. It did not do so. Hence it must be charged with having waived that potential basis of reducing the degree of its own liability or avoiding it altogether.
*366 We comment only briefly on the question, also not raised by these parties, of the judge's reallocation, after the grant of the judgment n.o.v., of the percentages of negligence as between plaintiff and Advance Elevator. Although we need not decide the issue because we are reinstating the jury's verdict, we nevertheless express our serious reservations. In reaching his conclusion the judge relied on Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 570, 410 A.2d 674 (1980). There the jury had assigned a percentage of negligence to plaintiff and each of two defendants. The Supreme Court held that plaintiff could not be chargeable with contributory negligence as a matter of law and consequently proportionately allocated the percentage assigned by the jury to plaintiff to the two defendants. We are not at all sure, however, that this technique works where it is one of the defendants who is absolved. It is, of course, possible, that the jury considered the negligence of all three parties seriatim as it were. But it may also be, particularly in light of the ultimate outcome charge which places plaintiffs on one side of the scale and defendants on the other, that the jury allocated negligence by sides, that is, 30% to plaintiff and 70% to defendants, and then reallocated defendants' aggregate 70% between the two individual defendants. Molding of a jury verdict is a useful and necessary technique when it accords both with law and the jury's intention. The verdict may not, however, be molded if the result reached might contravene the jury's intention. See, e.g., Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135, 576 A.2d 270 (1990). Our concern is that the way the verdict was molded here might well have done just that, and hence that a new trial would have had to have been held to determine the allocation unless the parties had agreed to the reallocation technique.
The judgment n.o.v. is reversed and we remand to the trial court for reinstatement of the jury verdict.